# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-KA-01792-SCT

*DEANDRE DAMPIER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/01/2006 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KELSEY LEVOIL RUSHING |
| | RAMEL LEMAR COTTON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | DAVID BYRD CLARK |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/24/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., CARLSON AND RANDOLPH, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1. Deandre Dampier was charged with the capital murder of Harry McGuffee, Jr. ("McGuffee") during the commission of a robbery. Dampier was found guilty by a jury. The circuit court sentenced him to serve a term of life imprisonment without the possibility of parole, as Dampier was a minor.

## FACTS

¶2. According to Dampier's July 23, 2004, statement, Jermaine Rogers ("Jermaine"):

> called me [on July 6, 2004] and he told me that he wanted me to come help
> him pick up these cars. . . . [H]e said Five Star [Auto Sales ("Five Star")]. . .
> . Then I said how you gonna get 'em and he said I'm gonna buy 'em. . . .

Then he said, [h]ow we gonna do is, I'm gonna get you to drive me up there, then I'm gonna get you to go to the store and park the car. Naw, that my [Dampier's] girlfriend [Tamesha McClendon] stays close over. I said take the cars to her house which is Indian Creek Apartments.

On July 7, 2004, Mark Dwayne Hankins loaned his .22 pistol to Jermaine, his neighbor at Eastside Manor Apartments in Magee. Hankins testified that Jermaine claimed he needed the gun because "he was going fishing and there were snakes and alligators where he was going."

¶3. Clarissa Rogers ("Clarissa"), Jermaine's wife, testified that on July 8, 2004, at approximately 9:30 a.m., Jermaine stated he was going to apply for a new job and left in their Toyota Corolla. From there, Jermaine drove to Dampier's residence.[1] When Dampier observed the gun on Jermaine, he asked "why'd you got your pistol with you? He said no reason." Dampier then drove the Corolla to Five Star with Jermaine in the passenger seat.

¶4. McGuffee owned and operated Five Star, a used car dealership located on Highway 49. At 11:04 a.m., McGuffee made a phone call to his wife, Charlotte McGuffee ("Charlotte"), from Five Star. According to Charlotte:

[w]e were talking about what the plans were for the day, and I heard the alarm go off. Someone had pulled right into the driveway.[2] . . . I said, "I'd better let you go because it sounds like you have a customer."

Captain Andrew Barrett of the Florence Police Department testified that in Dampier's July 9, 2004, interview, he stated "at Five Star . . . he went to turn into the parking lot, and

---

[1]Dampier was sixteen years old at the time.

[2]Charlotte further testified that the fact that the alarm did not stop indicated "[t]hat somebody pulled up and blocked the gate."

[Jermaine] told him, '. . . you need to stop right here at this gate,' blocking the gate."

Thereafter:

> Dampier stated . . . that [Jermaine] got out of the vehicle, went inside the building, came back out with Mr. McGuffee, and they were standing there looking at the green [Ford] Mustang. They had lifted the hood on the green Mustang,[3] and [Dampier] stated that [Jermaine] waved at him, indicating, "[o]kay, you can leave," and that he drove [the Corolla] from there back to [McClendon's] . . . apartment at Indian Creek Apartments, which is south on 49 from Five Star Auto . . . .[4] [H]e waited there until [Jermaine] showed up in the green Mustang.

¶5.    According to Dampier's July 9, 2004, statement, at McClendon's apartment, he:

> told her about what was goin' on down there[, Jermaine] wanted me to come get these cars for him and stuff, I told her that he had a pistol.[5] I didn't know he say what he was gonna do with it, he said he wouldn't gonna do nothing with it, so within no time, [Jermaine] came back, he picked me up [in the Mustang].

Upon arriving back at Five Star, Dampier stated that:

> I'm th[i]nking everythang's alright . . . I got . . . the Jeep and we drove off, got ready to drive off and [Jermaine] closed the gate and . . . he told me that the man, was . . . in a hurry so I'm th[i]nking the man was in a hurry, whatever so [Jermaine] closed the gate so we leave . . . .

---

[3]Rebecca Wood testified that she drove past Five Star "around 11:00 [a.m.]" Originally, Wood intended to go in "to make a payment," but because "there was a medium blue-colored car parked in the driveway that was kind of cross-ways . . . I didn't stop, I just kept going." Wood also observed that "McGuffee was standing out front of a Mustang with the hood up with a black gentleman's back to 49."

[4]According to Investigator Greg Eklund of the Rankin County Sheriff's Office, Five Star is 1.8 miles, or a "three minute" drive, from Indian Creek Apartments.

[5]In his July 23, 2004, statement, Dampier claimed that he informed McClendon that Jermaine had a gun, and that he felt uncomfortable about the situation, only later that evening.

3

Joe Ishee testified that he drove past Five Star at around 11:25 a.m. and noticed "a big colored man closing the gate. When I come by there he was closing that white gate, and he went through there. And there was an SUV, a dark-colored vehicle there." Jermaine then drove off the car lot in the Mustang and Dampier followed him southbound on Highway 49 in the Jeep.

¶6. Surveillance video subsequently was retrieved by law enforcement from Hot Wheels Auto, which is located south of Five Star, on the southbound side of Highway 49.[6] That video was sent to Richard Vorder Bruegge, Ph.D., who works in the Forensic Audio Video and Image Analysis Unit of the FBI in Quantico, Virginia. At trial, Dr. Vorder Bruegge was accepted as an expert in forensic image analysis and video analysis. After reviewing the video, Dr. Vorder Bruegge limited his focus to southbound traffic, as the video quality severely limited any conclusions regarding northbound vehicles.[7] Regarding the green Mustang, Dr. Vorder Bruegge concluded that if it "came down in that period from 11:00 to 12:00, then it was at . . . 11:25:32."[8] As to the black Jeep, Dr. Vorder Bruegge "found two instances in which there was a vehicle that was consistent. . . . One of them is at 11:25:42, and the other one was at 11:23." Ultimately, Dr. Vorder Bruegge concluded that if the black Jeep followed the green Mustang, as Dampier claimed, it did so at 11:25:42.

----

[6]According to Barrett, the surveillance video did not show "anything at Five Star. Just only north and southbound traffic that particular time of day."

[7]Robert Breithaupt, owner of Breithaupt Southern Images Photography and Video, was tendered by Dampier, and subsequently accepted, as an expert in video analysis. Breithaupt did not limit his conclusions to southbound vehicles.

[8]By contrast, Breithaupt concluded that a vehicle consistent with the green Mustang was traveling southbound at 11:18 a.m. and northbound at 11:22 a.m.

¶7.    In Dampier's July 23, 2004, statement, he noted that Jermaine pulled over to the side of the road soon after leaving Five Star, followed by Dampier, and "took the tag off the Jeep and the Mustang and put both of 'em in the trunk of the Mustang." Soon thereafter, Jermaine pulled off the road again, claiming that the car was running hot, and proceeded to the home of Claude Holloway. Dampier stated that Holloway was not home, therefore, they left the Mustang there and returned to Eastside Manor Apartments in the Jeep.[9]

¶8.    Allen Lewis discovered McGuffee's lifeless body. Lewis's emergency call was received at 11:50 a.m., and the first dispatch unit arrived by 12:01 p.m. According to Barrett, McGuffee "had two gunshot wounds to the forehead, . . . an exit wound to his cheek, . . . a gunshot wound in his left eye, and another one in the back of his head that was the entrance wound." An autopsy confirmed four gunshot wounds caused McGuffee's death. Upon arriving at the scene, Charlotte informed the police that the Mustang was missing from the car lot, and Barrett then determined that keys were missing to "[a] green Ford Mustang and a black Jeep Cherokee."[10]

¶9.    Clarissa testified that Jermaine arrived at Eastside Manor Apartments with Dampier at approximately 12:30 p.m. According to Clarissa:

> I asked Jermaine where were the keys to my car so that I could go ahead and leave for work. And he pulled a key out of his pocket and he kind of threw it

---

[9]By contrast, Holloway testified that he was home and informed Jermaine that "[y]our car's fan belt is broke. . . ." When Holloway advised Jermaine that he should "come around back behind the house and put some water in it[,]" Jermaine told him, "'I don't have time to put water in it.'" A young man was present and "driving the Jeep Cherokee."

[10]Additionally, McGuffee's wallet was not located at the crime scene despite the fact that he was known always to carry a wallet and cash.

on the couch, but it had a yellow tag on it. I read the tag, and it said that it was a 1996 Jeep Cherokee that was black. . . .

So I looked out the window at the vehicle, and I said, "[w]here did you get this from?" I said, "[y]ou didn't steal this, did you?"

He said, "[n]o."[11] He said, "[m]y aunt was going to help me get a loan and she did to get you a better vehicle."[12]

Furthermore, Clarissa testified that Jermaine said:

"my car broke down on Mary Grove, so I need to go and get it." . . .

Then he pulled out another key, and it had a yellow tag on it, and it said Ford Mustang. . . .

So I asked him for the paperwork on the vehicles. . . . I asked him where was my car. And he said it was in Florence at [Dampier's] girlfriend's apartment. I told him that I wanted to see the paperwork. He said he would bring it to my job. And I told him no . . . I would see it when I got off that night.

Clarissa then drove Jermaine and Dampier to Auto Zone in the Jeep and proceeded to her workplace.

¶10. At Auto Zone, Jermaine purchased a new fan belt and a wrench. Thereafter, Clarissa's sister, April, transported Jermaine and Dampier to the Mustang at Holloway's home. After fixing the belt,[13] Jermaine and Dampier drove back to Eastside Manor Apartments in the Mustang.

---

[11]Clarissa also testified that Dampier denied stealing the vehicle.

[12]By contrast, Dampier's statements provide that Jermaine informed Clarissa that he stole the money ($8,500) from his employer, Quality Foods.

[13]Eklund testified that Dampier's fingerprints were found on the fan belt case, a wrench, and "a tool that was used to . . . try or attempt to put the belt on."

¶11. At the apartment, Dampier stated that Jermaine requested that he fill out the title applications "cause his wife knew his handwriting." Dampier further claimed that Jermaine signed McGuffee's name on both title applications. After receiving a phone call, Jermaine informed Dampier that McGuffee "had been shot. And so like that I, what'd they kill him for. He told me that they found some drugs on him and they had stole a Crown Vic from his lot." Dampier then accompanied Jermaine when he returned the gun to Hankins.

¶12. On her way to work, Clarissa passed Five Star and noticed "a lot of police and . . . the news." This was significant to her as Jermaine "told me that he got the Mustang from that dealership."[14] At work, Clarissa learned about the incident at Five Star and left work early, returning to Eastside Manor Apartments. At the apartment, Clarissa demanded that Jermaine and Dampier show her the paperwork related to the vehicles. As Jermaine had told Clarissa that the paperwork was in the Corolla, Clarissa drove them to McClendon's apartment in the Jeep, and Jermaine then gave her some handwritten titles which Clarissa testified did not "look right." Thereafter, Clarissa returned to Eastside Manor Apartments in the Jeep, while Jermaine took Dampier home in the Corolla, before proceeding back to the apartment complex himself.

¶13. According to Barrett, at around 11:00 p.m.:

> I got a phone call from Rankin County dispatch, who stated that there was a man who had contacted them named Claude Holloway. He . . . stated that he knew who was driving the green Mustang that he had seen on the news, that

---

[14]Clarissa testified that "I remember seeing that Mustang there, and I don't remember seeing the Jeep there, but before Jermaine had looked at that Mustang and we couldn't afford what Mr. McGuffee was asking."

his name was Jermaine. He did not know the last name at the time, but he knew he lived in Eastside Apartments. . . .

Officers from the Magee Police Department and the Florence Police Department then proceeded to Eastside Manor Apartments, where they observed the Mustang and the Jeep side-by-side in parking spaces directly below Jermaine's apartment. In the apartment, Barrett testified that Jermaine:

> walked over to the kitchen drawer . . . pulled out some applications for titles . . . and handed them to me. I immediately noticed they were handwritten. I noticed there were different spellings on the titles for Mr. McGuffee's name. I also noticed that the VIN number was the same on both applications for titles for the Jeep and the Mustang.

While Jermaine insisted that he purchased the vehicles on July 6, 2004, a subsequent call to McGuffee's family revealed that Five Star had not been open for business that day. Jermaine was then taken into custody and transported to the Magee Police Department.[15]

¶14.    In the early morning hours of July 9, 2004, Hankins called the Florence Police Department, informed them that his gun may have been used in the incident at Five Star, and delivered the gun and its spent casings to police. Subsequently, officers proceeded to the home of Dampier's father, were granted permission to search, and then transported Dampier to the Florence Police Department. At the police department, Barrett took Dampier's initial statement.

---

[15]A DNA match of McGuffee's blood was later found on a pair of Nike Air Jordans seized from Jermaine's apartment.

8

¶15. On February 9, 2005, Jermaine and Dampier were indicted in the Circuit Court of Rankin County for capital murder and conspiracy to commit murder.[16] On August 29, 2006, Dampier's jury trial commenced.[17] At trial, the State offered the testimony of Kenneth Harth, who was an inmate in the Rankin County jail from January 7, 2004, until November 10, 2004,[18] and was housed in the same cell block as Dampier. Harth testified that Dampier:

> got to telling me what had happened in his situation and why he was there. And he told me that he and [Jermaine] had planned a robbery, and that [Jermaine] had knew the man that owned the car lot, and that they were in need for some money, and that [Jermaine] promised him that he would get a truck out of the deal. . . . And he told me that in the process of the robbery, that he had taken cash and that he had taken a cell phone, and that he had drove . . . a Jeep Cherokee, off the lot of the car dealership.

While Jermaine did the shooting, Dampier told Harth that he "was the one . . . who was supposed to carry out the robbery and . . . the murder, and [Jermaine], I guess, assumed that he could do it and they were going to have to kill the man because the man knew [Jermaine]."[19]

---

[16]Jermaine pleaded guilty in October 2005 and is presently serving a life sentence. Based upon Dr. Vorder Bruegge's report, an arrest warrant was issued for McClendon, and she also was charged with capital murder.

[17]At trial, the State decided to go forward on the capital murder charge only and did not seek the death penalty due to "the fact that [Dampier] was 16 at the time of the offense."

[18]Following a conviction for grand larceny and drug possession.

[19]According to Harth, he did not strike a deal in giving information to police. He claimed that after completion of his sentence in Mississippi, he returned to jail in his home state of Tennessee, as suspended time was revoked on his prior felony convictions for habitual driving without a valid license.

¶16. The jury found Dampier guilty of capital murder. The circuit judge then sentenced Dampier to "life without parole[,]" adding that "this sentence is as justified as any of them that I've ever handed down."

## ISSUES

¶17. This Court will consider:

(1) Whether Dampier was entitled to a representative jury venire.
(2) Whether the crime scene photographs were overly prejudicial.
(3) Whether the circuit court erred in refusing to give a lesser-offense instruction.
(4) Whether the circuit court erred in refusing Dampier's Instruction D-4.
(5) Whether the circuit court erred in granting State's Instruction S-6 and refusing Dampier's Instruction D-10.
(6) Whether the circuit court committed reversible error in granting only one of Dampier's proposed jury instructions.
(7) Whether the comments made by the State in closing argument were plain error.

## ANALYSIS

### I. Whether Dampier was entitled to a representative jury venire.

¶18. African-Americans compose roughly eighteen percent of Rankin County's population. At trial, Dampier argued that the jury venire lacked fair representation, as there was only one African-American among its thirty-eight members.[20] Specifically, Dampier's argument is "not necessarily the process in which they were chosen per se. It is the outcome of that process...." Carol Swilley, the Rankin County Circuit Clerk, testified that "because of the new ... State Election Management System program, all 82 counties in the state of Mississippi are using the same jury selection program.... [T]he system is set up to follow

_____

[20]Initially, there were four African-Americans among fifty-three members prior to individuals being excused.

10

exactly what the code section says." As such, the 12,000 available names in Rankin County, which in no way identify race, were "randomly drawn through the computer into the jury pool." The circuit court concluded that:

> there has been just no showing of purposeful discrimination. And I believe that the testimony provided by Ms. Swilley – I don't know quite frankly what more that the circuit clerk's office can do in relation to having an impartial venire drawn. So that being the case, I'm going to take your motion as a motion to quash the entire venire, and it will be denied.

¶19. On appeal, Dampier argues that the discriminatory effect alone "was prejudicial and the case should be reversed." The State initially responds that this issue "is procedurally barred because of failure to cite legal authority to support [Dampier's] argument . . . ." Next, in addressing the merits, the State argues that Dampier cannot establish a prima facie case that the cross-section requirement was violated as "the testimony of the Rankin County Circuit Clerk which described the process by which potential jurors are randomly selected by computer shows that systematic exclusion of any racial group would be virtually impossible."

¶20. This Court finds this issue procedurally barred as "the failure to cite authority in support of an argument eliminates our obligation to review the issue." *Glasper v. State*, 914 So. 2d 708, 726 (Miss. 2005) (citing *Byrom v. State*, 863 So. 2d 836, 863 (Miss. 2003)).

¶21. Procedural bar notwithstanding, this Court also finds that this issue is without merit. Dampier cites *Craft v. State*, 380 So. 2d 251, 255 (Miss. 1980), for the proposition that discriminatory effect will suffice, even in the absence of discriminatory intent. A review of *Craft* reveals no such statement. *Craft* supports the proposition that a discriminatory effect

11

in the context of "persistent absence of under-representation of a race on juries raises a prima facie case of discrimination." *Id*. (citations omitted). No evidence of such is presented here.

¶22. In ***Haynes v. State***, 934 So. 2d 983, 986 (Miss. 2006), this Court outlined the necessary elements for establishing "a violation of the right to an impartial jury representing a fair cross-section of the community. . . ." *Id*. As in ***Haynes***, "the venire from which the jury was selected was produced by a computer which randomly selected names from the voter rolls of Rankin County." *Id*. Furthermore, Dampier "objected only to the results of the selection process, not the manner in which the jury was drawn." *Id*. at 987. As such, Dampier "has failed to make a showing of any of the prima facie elements," and this Court concludes that this argument is without merit. *Id*.

## II. Whether the crime scene photographs were overly prejudicial.

¶23. At trial, Dampier objected to the admission of multiple crime scene photographs. Regarding State's Exhibits 21 through 29, Dampier argued that:

> it is uncontested that [McGuffee] was killed[,] . . . was shot[,] . . . [and] was in the building, lying on the floor. We have . . . testimony from the person who . . . found him [Lewis]. The prejudicial effect of this highly outweighs the probative value that it might have since it is uncontested.

The State responded that:

> the testimony shows that, number one, this was a bloody scene. There's been some statements on cross[-]examination that we have Mr. McGuffee's blood on [Jermaine]. Those pictures are necessary to show it was a bloody scene at the area in front of the desk and the splatter away from the body was not that great. That would explain the absence of blood on [Dampier]. That's what we expect the officer to testify, about the blood splatter. Further, the position of the body is important and ha[s] evidentiary value. The finding of the bullet fragments have evidentiary value.

The circuit court admitted the photographs, concluding that "[u]nder the 403 standard, the probative value is not outweighed by the prejudicial effect."

¶24.   Regarding State's Exhibits 56 and 57, counsel for Dampier stated "we're just restating our other argument that it's more prejudicial than probative, and at this point it appears to be merely cumulative because there are similar photos taken."  As to Exhibit 56, the circuit court found that "doing the balancing test . . . this does show the location of the bullet fragment relative to the victim.  The probative value is not substantially outweighed by the prejudicial effect.  That one will be admitted. . . ."  Addressing Exhibit 57, the circuit court concluded that the photograph would aid the State's argument that the body had been moved and found that "the probative value is not substantially outweighed by the prejudicial effect. . . ."[21]

¶25.   Mississippi Rule of Evidence 403 provides, in pertinent part, that relevant evidence "may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of . . . needless presentation of cumulative evidence." Miss. R. Evid. 403 (emphasis added). "The admission of photographs is a matter left to the sound discretion of the trial judge and . . . *his decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion*." *Noe v. State*, 616 So. 2d 298, 303 (Miss. 1993) (citing *Gardner v. State*, 573 So. 2d 716 (Miss. 1990)) (emphasis added).  The discretion of the trial judge is "*almost* unlimited . . .

---

[21]Regarding the photographs composing State's Exhibits 50 through 57, the circuit court found that the probative value was not substantially outweighed by the prejudicial effect.

13

regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Noe*, 616 So. 2d at 303 (quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)). So long as a photograph "has probative value and its introduction serves a meaningful evidentiary purpose[,]" it may still be admissible despite being "gruesome, grisly, unpleasant, or even inflammatory." *Id.* (citations omitted). In this case, the trial court's burden was substantially lessened, as the photographs failed to exhibit elements of gruesomeness. *Compare to McNeal v. State*, 551 So. 2d 151 (Miss. 1989) (solitary instance of photographs being held prejudicial involving a close-up photograph of a partly decomposed, maggot-infested skull). "Photographs are considered to have evidentiary value in the following instances: (1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; (3) supplement or [clarify] witness testimony." *McIntosh v. State*, 917 So. 2d 78, 84 (Miss. 2005) (quoting *Spann v. State*, 771 So. 2d 883, 895 (Miss. 2000)).

¶26.    The circuit court applied the test of Mississippi Rule of Evidence 403 to each of the photographs and determined that the probative value was not substantially outweighed by the prejudicial effect. The circuit court also noted a meaningful evidentiary purpose and probative value of each specific photograph. Therefore, this Court finds that the circuit court did not abuse its discretion in their admission. *See Noe*, 616 So. 2d at 303. Accordingly, this issue is without merit.

### III. Whether the circuit court erred in refusing to give a lesser-offense instruction.

¶27.    Proposed Instruction D-2 provided that:

[t]he Court instructs the jury that an *accessory after the fact* is one who conceals, receives, aids or assists any person, knowing that such person has

committed a felony, with intent to enable such person to escape or avoid arrest, trial, conviction or punishment, after the commission of such felony.

If you should find beyond a reasonable doubt that [Dampier] concealed, received, relieved, aided or assisted any person, knowing that such person had committed a felony, with the intent to enable such person to escape or avoid arrest, trial, conviction or punishment, after the commission of such felony, then you may return a verdict of guilty of accessory after the fact.

(Emphasis added). Following the State's objection, the circuit court refused the instruction for lack of evidence to "support a verdict of the lesser included." In so finding, the circuit court determined that:

all the way through [Dampier's] statement not only did he maintain his innocence that he didn't have anything to do with it, he maintained that he didn't even know that it happened up until that time of that interview. . . . [I]f he takes that position, I don't know what evidence there is in the record that would support the lesser included verdict.

¶28. Accessory after the fact is a separate and distinct crime from capital murder and, as such, the issue is whether Dampier is entitled to a "lesser-offense," not a "lesser-included-offense," instruction. *See Byrom*, 863 So. 2d at 874. The evidentiary standard for lesser-offense instructions is the same as for lesser-included offense instructions. *See Gangl v. State*, 539 So. 2d 132, 136-37 (Miss. 1989). "To be entitled to a lesser-included offense instruction, [the defendant] must point to evidence in the record from which a jury could reasonably find him not guilty of the crime with which he was charged and at the same time find him guilty of the lesser included offense." *Ladnier v. State*, 878 So. 2d 926, 932 (Miss. 2004) (citing *Toliver v. State*, 600 So. 2d 186, 192 (Miss. 1992)). *See also Gangl*, 539 So. 2d at 136 ("lesser offense instructions should not be granted indiscriminately, and only where there is an evidentiary basis in the record."). "One *cannot* be both a principal in the crime

15

and an accessory after the fact." ***Mangum v. State***, 762 So. 2d 337, 343 (Miss. 2000) (quoting ***Hoops v. State***, 681 So. 2d 521, 534 (Miss. 1996)) (emphasis added). The elements of accessory after the fact are:

> (1) a completed felony has been committed; (2) the accused concealed, received, relieved, aided, or assisted a felon, knowing that such person had committed a felony; and (3) such assistance or aid was rendered with the intent to enable such felon to escape or avoid arrest, trial, conviction, or punishment after the commission of such felony.

***Byrom***, 863 So. 2d at 874-75 (citing Miss. Code Ann. § 97-1-5 (Rev. 2006)). To find Dampier guilty of capital murder, the jury did not need to find he was the shooter. *See* ***Randall v. State***, 716 So. 2d 584, 590 (Miss. 1998). In fact, "[e]very person who shall be an accessory to any felony, before the fact, shall be deemed and considered a *principal*, and shall be indicted and punished as such. . . ." Miss. Code Ann. § 97-1-3 (Rev. 2006) (emphasis added).

¶29.    Lesser-offense instructions should be granted only where an evidentiary basis exists for them. *See* ***Gangl***, 539 So. 2d at 136-37. In the case *sub judice*, the evidence presented raises only the issue of Dampier's role as a principal, not an accessory after the fact. According to Dampier's own statement, he discussed going to Five Star with Jermaine on July 6, 2004. Moreover, he stated that he observed the gun on Jermaine on July 8, 2004, but believed Jermaine was not going to use it. He further stated that he became uncomfortable about the incident only later that evening, but remained unaware that any felony had been committed. By contrast, the State presented evidence, via the combination of Harth's testimony and Dampier's admission of blocking the Five Star gate, driving off the Five Star lot in the Jeep, and filling out the forged title applications, that Dampier was a principal in

16

the crime. In either case, whether Dampier was ignorant, as he alleges, or was a principal

by statute, an accessory-after-the-fact instruction lacked an evidentiary basis. Therefore, this

Court concludes that this issue is without merit and the circuit court did not err in refusing

Instruction D-2.

### IV. Whether the circuit court erred in refusing Dampier's Instruction D-4.

¶30.    Proposed Instruction D-4 provided that:

> [e]ach fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

The State objected, arguing that "[Instruction] S-1[22] requires us to prove each of those

elements beyond a reasonable doubt. To the extent that this tries to do anything more than

this, it is inappropriate." The circuit court refused Instruction D-4 "because I believe it's

---

[22]Instruction S-1 states:

[Dampier] has been charged by indictment with the felony crime of capital murder.

If you find from the evidence in this case *beyond a reasonable doubt* that [Dampier], on or about July 8, 2004, in Rankin County, Mississippi, did willfully, unlawfully, and feloniously, with deliberate design and of his malice aforethought, then and there, kill and murder Harry McGuffee, Jr., a human being, by shooting him in the head, when engaged in the commission of a robbery, then you shall find [Dampier] guilty as charged.

*If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find [Dampier] not guilty of capital murder.*

(Emphasis added).

17

*cumulative*. But also relative to that last paragraph, I think that's an incorrect statement of the law." (Emphasis added).

¶31. Dampier asserts that Instruction D-4 "addresses inference testimony" and was denied, while Instruction S-5,[23] effectively stating that "an inference can be drawn that [Dampier] participated in the capital murder because he may have been in possession of a stolen vehicle[,]" was granted. As such, Dampier argues that the circuit court committed reversible error by "allow[ing] the [S]tate to argue that possession of a stolen vehicle gives the inference, but . . . not allow[ing] [Dampier] the opportunity to argue that all inferences have to be proven beyond a reasonable doubt." The State responds that Dampier's argument is without merit, as the substance of Instruction D-4 was fairly covered in other instructions, and Instruction S-5 was identical to the approved instruction in *Harris v. State*, 908 So. 2d 868, 872 (Miss. Ct. App. 2005).[24]

¶32. This Court has stated that:

"[w]hen considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, *we read them as a whole to determine if the jury was properly instructed*." **Burton ex rel. Bradford v. Barnett**, 615 So. 2d 580, 583 (Miss. 1993). Similarly, this Court has stated that "[i]n determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, *if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found*." **Coleman v. State**, 697 So. 2d 777, 782 (Miss. 1997) (quoting **Collins v. State**, 691 So. 2d 918 (Miss. 1997)).

---

[23]Instruction S-5 stated "[t]he Court instructs the jury that the possession of property recently stolen is a circumstance which may be considered by the jury and from which, in the absence of a reasonable explanation, the jury may infer guilt."

[24]This Court does not address the State's erroneous argument that the issue is procedurally barred by virtue of the fact that Instruction D-4 is not included in the Clerk's Papers. That instruction is contained within the record in Court Exhibit 1.

18

In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.

*Milano v. State*, 790 So. 2d 179, 184 (Miss. 2001) (emphasis added). This Court finds that the reasonable-doubt standard was adequately addressed in Instruction S-1, which required each capital murder element to be proved beyond a reasonable doubt. As Instruction S-1 "fairly announce[s] the law" on reasonable doubt and, therefore, "create[s] no injustice," *Coleman*, 697 So. 2d at 782, this Court concludes that the circuit court did not err in refusing Instruction D-4 as "cumulative."[25] Accordingly, this issue is without merit.

### V. Whether the circuit court erred in granting State's Instruction S-6 and refusing Dampier's Instruction D-10.

¶33. Proposed Instruction D-10 provided that:

[t]he law permits evidence of certain persons who are termed expert. Experts may testify to their opinions derived from their knowledge of particular matters. However, the ultimate weight to be given to expert testimony is a question to be determined by you. The testimony of any expert, like that of any other witness, is to be received by you and given such weight only as you think it is properly entitled to receive. You are not bound by the opinion testimony of any witness, expert or otherwise.

In response, the State submitted Instruction S-6, which stated:

[y]ou will recall that individuals have testified as experts in this case. You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. *If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.*

---

[25]This Court adds that Instruction S-5 "fairly announces the law[,]" *Coleman*, 697 So. 2d at 782, and was properly granted by the circuit court. *See Harris*, 908 So. 2d at 872.

19

(Emphasis added). In support thereof, the State provided that "the instruction . . . submitted as S-6 comes out of *Jones v. State*, 918 So. 2d 1220[, 1228-29 (Miss. 2005)]. I basically took that language out of the instruction that was approved in that case." While objecting to Instruction S-6, counsel for Dampier acknowledged that "I don't have the case that supports D-10 because there was a misunderstanding with me." Thereafter, the circuit court granted Instruction S-6 and refused Instruction D-10.

¶34. On appeal, Dampier argues that the circuit court "abused its discretion in denying D-10 and substituting i[t] for S-6," in that:

> instead of allowing the jurors to simply weigh the testimony of each expert and give it weight they think it deserves, [Instruction S-6] instructs them in part that they may disregard expert testimony because of education and experience. This is crucial because this trial rested heavily on the testimony of the video experts. [Dampier's] expert was a professional photographer and videographer who had done consulting work that was mostly civil. The State's expert worked for [the FBI]. By being allowed to substitute the instructions, the State was able to suggest to the jury that Dampier's expert's testimony could be disregarded because of training and experience.[26]

The State responds that:

> Dampier cites absolutely no case law, nor gives any rational explanation, to support a finding that [I]nstruction S-6 was in any way erroneously given. Furthermore, when the trial court asked each side for authority to support their similar instructions regarding expert testimony, the State provided the trial court with citations, while defense counsel failed to provide authority to support his instruction based on some "misunderstanding with me."

---

[26]This Court finds Dampier's argument regarding expert stipulations to be procedurally barred as he failed to request an appropriate instruction thereon. *See Towner v. State*, 726 So. 2d 251, 255 (Miss. Ct. App. 1998) (citing *Ballenger v. State*, 667 So. 2d 1242, 1252 (Miss. 1995)).

(Citation omitted).[27]

¶35. This Court finds that Instruction S-6 "fairly announce[s] the law of the case" on weighing expert testimony[28] and, therefore, "create[s] no injustice." **Coleman**, 697 So. 2d at 782. Therefore, we conclude that this issue is without merit and the circuit court did not err in refusing Instruction D-10 and granting Instruction S-6.

**VI. Whether the circuit court committed reversible error in granting only one of Dampier's proposed jury instructions.**

¶36. The circuit court refused all of Dampier's proposed instructions, except for Instruction D-1, regarding Dampier's constitutional right not to testify. Dampier now contends that the circuit court erred in denying ten of the eleven jury instructions he offered, adding that Instructions D-4 and D-6 were among the refused instructions, despite being model jury instructions. In response, the State maintains that "this issue is so meritless as to be frivolous. If a defendant submits twenty jury instructions which are fairly covered elsewhere, without foundation in the evidence, or incorrect statements of law, then all twenty instructions will be properly refused."[29]

¶37. Preliminarily, this Court finds this issue procedurally barred as Dampier fails to cite any authority in support of his argument. *See* **Glasper**, 914 So. 2d at 726. Procedural bar

---

[27]This Court does not address the State's erroneous argument that this issue is procedurally barred by virtue of the fact that Instruction D-10 is not included in the record. That instruction is contained within the record in Court Exhibit 1.

[28]Instruction S-6 is identical to the granted instruction in **Jones**. *See* **Jones**, 918 So. 2d at 1228-29.

[29]This Court does not address the State's erroneous argument that this issue is procedurally barred by virtue of the fact that Dampier's instructions are not included in the record. Those instructions are contained in Court Exhibit 1.

21

notwithstanding, this Court concludes that because the granted instructions "taken as a whole

fairly, but not necessarily perfectly, announce the applicable rules of law, no error results."

*Milano*, 790 So. 2d at 184. Accordingly, this issue is without merit.

### VII. Whether the comments made by the State in closing argument were plain error.

¶38.    In closing argument, counsel for the State made the following statements:

> I suspect that sometime that afternoon whenever they came back from Magee, Clarissa, Jermaine, and Deandre to Tamesha's apartment, and Clarissa and Jermaine went back south, I suspect if they had not done it before, that there was a conversation that "I'm going to say you were over there, and I'll say I drove the Toyota over here and you weren't even involved, Tamesha. I'll just say I drove the Toyota over here, and he came and picked me up in the Mustang. That gets you off the scene and takes me off the scene while the man is being killed. I'll say we don't know nothing about it. Okay?" Is that the defense? Well, we have something to prove that that's a lie.
>
> . . . .
>
> Is there any possibility that they were giving Clarissa that Jeep to satisfy her to keep her from going to the police?
>
> . . . .
>
> That paperwork that afternoon was nothing more than to try to get [Clarissa] to not go to the police. That's what that was about, because she was pushing it.

Dampier now argues that these comments were:

> without any foundation at all. It was completely made for the sole purpose of inflaming the sentiments of the jury. It had no basis in facts presented at trial. While [Dampier] did not make an objection at trial, the comments were so outrageous that the trial court should have objected on its own motion. Because the comment was so inflammatory, this case should be reversed.

The State responds that the comments:

22

of which Dampier complains amount to no more than the State properly arguing its theory of the case and making deductions and conclusions based on the evidence presented. The comments were in no way improper. Furthermore, they could not have prejudiced Dampier as they did not concern his obvious guilt. Rather, the statements relate to the involvement of Dampier's confederates.

Alternatively, the State argues that if the prosecutor's comments were improper, they did not prejudice Dampier, and the error was harmless.

¶39. "In general, the failure to object to the prosecution's statements in closing argument constitutes a procedural bar. . . . However, in extreme cases, a failure to object to questions which were violative of a constitutional right will not act as a procedural bar to consideration." *Ross v. State*, 954 So. 2d 968, 1001-1002 (Miss. 2007) (citations omitted). Absent the application of a procedural bar, this Court has stated that:

> *[a]ttorneys are allowed a wide latitude in arguing their cases to the jury. However, prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.* ***Hiter v. State***, 660 So. 2d 961, 966 (Miss. 1995). The *standard of review* that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is *whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.* ***Ormond v. State***, 599 So. 2d 951, 961 (Miss. 1992).

*Sheppard v. State*, 777 So. 2d 659, 661 (Miss. 2000) (emphasis added). *See also* ***Brown v. State***, 907 So. 2d 336, 341 (Miss. 2005). In closing argument, that "wide latitude" extends "not only to the facts presented in evidence, but also to deduction and conclusions he may reasonably draw therefrom, and the application of the law to the facts." *Sanders v. State*, 801 So. 2d 694, 704 (Miss. 2001) (quoting ***Wells v. State***, 698 So. 2d 497, 506 (Miss. 1997)). However, "[a]rguing statements of fact which are not in evidence or necessarily inferable

23

from facts in evidence is error when those statements are prejudicial." ***Ross***, 954 So. 2d at 1002 (citations omitted).

¶40. Preliminarily, this Court concludes that Dampier's failure to object to the now-disputed comments in closing argument creates a procedural bar, as those comments did not infringe upon Dampier's constitutional rights. *See **Ross***, 954 So. 2d at 1001. Assuming *arguendo* that the procedural bar is inapplicable, this Court must determine (1) whether the individual comments constituted "improper argument" and (2) if so, whether that "improper argument" created "unjust prejudice" against Dampier. ***Sheppard***, 777 So. 2d at 661. Applying that standard, "[w]e find the substance of th[ese] argument[s] is not out-of-bounds for closing arguments; so there is no plain error to be found there either." ***Minor v. State***, 831 So. 2d 1116, 1123 (Miss. 2002).

¶41. This Court finds that one reasonably could infer that the use of forged title applications to deter Clarissa from contacting the police could be argued as a logical deduction from the evidence presented. Immediately after asking Jermaine and Dampier if they stole the vehicles, Clarissa demanded "to see the paperwork." Jermaine first told her that the paperwork was at McClendon's apartment and then had Dampier fill out the blank title applications because Clarissa "knew his handwriting." Given that testimony, this comment was well within the "wide latitude" extended to attorneys in closing argument. ***Id***.

¶42. As to the comment regarding whether there was "any possibility that" Jermaine and Dampier were giving Clarissa the Jeep as incentive not to contact the police, this Court finds nothing improper. When Clarissa asked for the keys to the Corolla, Jermaine immediately gave her the keys to the Jeep. According to Harth's testimony, however, Jermaine promised

24

Dampier that "he would get a truck out of the deal." The form of the question posed by the State in closing argument is only whether "any possibility" existed that Clarissa was given the Jeep in an attempt to encourage her inaction. Based upon the evidence presented, the argument could be made that one logically could deduce giving Clarissa the Jeep originally intended for Dampier was an attempt to dissuade her from contacting the police. Accordingly, this Court concludes that this comment was within the "wide latitude" extended to attorneys in closing argument.

¶43. Finally, this Court addresses the comment suggesting a possible conspiratorial conversation between Dampier and McClendon. Dr. Vorder Bruegge testified that if the green Mustang "came down [Highway 49] in that period from 11:00 to 12:00, then it was at . . . 11:25:32." Dr. Vorder Bruegge further testified that if the black Jeep followed the green Mustang, as Dampier claimed, then it did so ten seconds later at 11:25:42. If a trier of fact accepted that testimony, he or she could conclude that Jermaine did not pick up Dampier at McClendon's apartment before returning to Five Star for the Jeep. That testimony suggests that Dampier remained at Five Star for the entire nineteen-minute time frame between the end of Charlotte's conversation with McGuffee and the point at which the vehicles left the Five Star lot. As such, the Corolla necessarily would have been brought to McClendon's apartment by a third party.[30] The circuit judge stated that "[i]t seems rather clear to me that [Dampier] and [Jermaine] were let out at the dealership and committed the crime that they did, and then got in the two vehicles and headed south." Therefore, we conclude that the

---

[30]An arrest warrant was issued for McClendon, and she was charged with capital murder.

25

substance of the comment lies within an acceptable range of deductions and conclusions which reasonably may be drawn from the facts presented in evidence. *See Sanders*, 801 So. 2d at 704. Such comments encourage deductive reasoning by a jury, as opposed to speculation.[31] Thus, no plain error is present.

## CONCLUSION

¶44. Accordingly, this Court affirms the final judgment and sentence of the Circuit Court of Rankin County as to Dampier.

¶45. **CONVICTION OF CAPITAL MURDER AND SENTENCE TO SERVE A TERM OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY.**

---

[31]Furthermore, this Court notes that Jury Instruction No. 11 guided the jury in assessing the closing arguments, stating:

[t]hey should not intentionally try to mislead you. However, if their recollection of the evidence differs from what your recollection is, you must follow your own recollection. *If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark.*

(Emphasis added).