# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00100-COA

ROBERT ANTHONY MAYE A/K/A ROBERT MAYE       APPELLANT

v.

STATE OF MISSISSIPPI       APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/01/2019 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/25/2022 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McCARTY AND SMITH, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. Following a jury trial, Robert Maye was convicted of first-degree murder for shooting and killing his girlfriend. On appeal, Maye argues that the trial judge erred by refusing a heat-of-passion manslaughter instruction and by admitting a gruesome photograph. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Maye lived with Jacqueline Davis and her two children in Davis's mobile home in Rawls Springs in Forrest County. Maye and Davis had been dating for about six years. On November 2, 2018, Davis was working at Shoney's in Hattiesburg. Maye went to Shoney's

to get a house key from Davis. Davis appeared to be scared, so Davis's coworker Jamia Rogers went outside and gave Maye the key while Davis hid in the back of the restaurant. Rogers noticed that Maye was visibly upset when she gave him the key. After work, Davis picked up her cousin Monet Williams, and they went to Davis's home to change clothes before attending a football game.

¶3.     Maye met Davis and Williams at the door at Davis's home. Williams sat in the living room with Maye while Davis gathered clothes in her bedroom. Williams went outside to look for Davis's daughter, M.D.,[1] and sat in Davis's car. A neighbor dropped M.D. off at home, and M.D. went inside. M.D. testified that a stranger opened the door for her and that Maye told her to go to her room and not open her door for anyone. The stranger was later identified as Maye's stepbrother Lee Thompson. M.D. heard Maye tell Thompson to "give [him] the gun." M.D. then heard Davis say to Maye, "What are you doing to me?" Davis sounded scared. M.D. next heard a gunshot. A few minutes later, Williams looked up and saw Maye walking toward Davis's car from the woods behind the home. Maye told her to call 911 because Davis had been shot. Williams ran into the home and found Davis lying on the bathroom floor and a "bunch of blood."

¶4.     Deputy Kenny Johnson of the Forrest County Sheriff's Department was notified of a possible shooting at Davis's home and was the first law enforcement officer to arrive at the scene. He entered the home and found Maye sitting on the bathroom floor with Davis's body

---

[1] Initials are used to protect the privacy of the minor child.

in his lap. Johnson described Maye as "calm" and "not upset about anything." Johnson arrested Maye, and an investigator performed gunshot residue tests on Maye and Williams. Gunshot residue was positively identified on Maye's left palm and the back of his left hand. Particles indicative of gunshot residue were found on Maye's face, right palm, and the back of his right hand. Williams's test results showed only particles indicative of gunshot residue on the back of her right hand, her face, and her left palm.[2]

¶5. Investigator Jeff Byrd testified that there were bloody towels near Davis's body on the bathroom floor, and it appeared that someone had tried to clean up some of the blood. Also, there was "some blood splatter on the tub," making it appear that there had been "some kind of altercation." Williams testified that the bathroom appeared differently in Byrd's crime-scene photographs than when she had seen it just after Davis was killed. Williams said that when she first entered the bathroom, there was more blood on the floor and there were no bloody towels.

¶6. A K-9 search team was deployed in the woods behind the home, and a dog alerted to a claw hammer, indicating that the "hammer . . . had recent human odor on it." Byrd testified that Davis had two small holes above her left eye. At the time, this caused Byrd to suspect that the hammer was the murder weapon. Officers also found a box of .40-caliber

---

[2] David Whitehead, a forensic scientist at the Mississippi Crime Laboratory, testified that particles indicative of gunshot residue could be transferred to a person who enters or touches an object in a room in which a gun was recently discharged. On cross-examination, Whitehead acknowledged that it was also possible for actual particles of gunshot residue to be transferred in the same manner.

ammunition in the woods behind the home. In a cabinet inside the home, they found an empty box for a Hi-Point .40-caliber S&W pistol.

¶7. Dr. Mark LeVaughn, Chief Medical Examiner for the State, testified that Davis died of a gunshot wound to her head. There was no evidence of any other traumatic injury. Bullet fragments recovered from Davis's head were consistent with .40-caliber ammunition.

¶8. Officers interviewed Maye at the sheriff's office on two separate days. Maye initially claimed that on the day of Davis's murder, after Williams walked outside the mobile home, he and Davis walked into Davis's son's bedroom and encountered a man who was pointing a gun at them. At first, Maye claimed that he did not know the man and had never seen him before. Later, however, Maye said that he had seen the man several times but did not know much about him other than his nickname. Finally, Maye said that the man was his stepbrother, Lee Thompson. Maye said that Davis ran across the home to her bathroom after she saw Thompson with a gun. He said that M.D. walked into the home shortly thereafter, and he told M.D. to go to her room, shut her door, and not open her door for anyone. Maye said that Thompson then followed him into the bedroom and told him and Davis to get on their knees in the bathroom and bow their heads. According to Maye, Thompson shot Davis and then fled.

¶9. Maye's account of what occurred next also changed over time. Initially, Maye said that he immediately grabbed Davis and held her before going outside to look for Thompson in the woods behind the home. He denied carrying a hammer or a box of bullets into the

4

woods. At trial, Maye added that he carried the hammer to the woods when he went to look for Thompson.

¶10. Officers interviewed Thompson after he was arrested several days later. Thompson initially denied being at the home when Davis was shot. Eventually, he admitted that he was in the living room when Maye shot Davis and that he ran from the home immediately after he heard the gunshot. Before Maye's trial, Thompson accepted a plea bargain that required him to testify against Maye. At trial, Thompson testified that he and Maye met at Checker's in Hattiesburg. Maye and Thompson drove to Lawrence County and back to Rawls Springs in Davis's Chevrolet Tahoe, drinking beer as they went. When they arrived at Davis's mobile home, Maye handed Thompson a gun. When M.D. came home, Thompson opened the door for her, and Maye took her to her room. According to Thompson, Maye initially wanted him to "scare" Davis but then offered to give Thompson his Tahoe if Thompson would kill Davis. Thompson "wasn't with that," so Maye took the gun back from Thompson and then shot Davis himself. Thompson ran from the mobile home like "a track star" as soon as he heard the gunshot.

¶11. Maye testified at trial. He denied killing Davis and alleged that Thompson shot and killed her. Maye testified that he and Thompson had gone to a pawn shop in Monticello on the day of the murder. Maye bought hollow point bullets for his gun at the pawn shop. He testified that he needed the bullets "for protection" because there had been a break-in at Davis's mobile home. Maye and Thompson then drove to Davis's mobile home in Rawls

5

Springs. Maye claimed that Thompson shot Davis at the mobile home and then fled.

¶12. A Forrest County grand jury indicted Maye for first-degree murder (Count I); indicted Maye and Thompson for conspiracy to commit first-degree murder (Count II); and indicted Thompson as an accessory before the fact to first-degree murder (Count III).[3] Thompson pled guilty to Count II. Prior to Maye's trial, the State nolle prosequied Count II as to Maye. After a four-day trial, the jury found Maye guilty of first-degree murder. The court sentenced Maye to life imprisonment. Maye filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal. On appeal, he argues that the trial judge erred by refusing a jury instruction on heat-of-passion manslaughter and by admitting a gruesome photo of Davis's face into evidence.

## ANALYSIS

### I. The trial judge did not err in refusing to instruct jury on heat-of-passion manslaughter.

¶13. Maye argues that the trial judge erred by refusing to instruct the jury on the lesser-included offense of heat-of-passion manslaughter. *See* Miss. Code Ann. § 97-3-35 (Rev. 2020). Although Maye testified and denied that he had killed Davis, he argues that he was entitled to a heat-of-passion manslaughter instruction based on the State's theory that he was angry that Davis was in the process of ending their long-term relationship. However, the trial

---

[3] An accessory before the fact is considered and punished as a principal. Miss. Code Ann. § 97-1-3 (Rev. 2020); *Johnson v. State*, 290 So. 3d 1232, 1238-39 (¶¶24-29) (Miss. 2020).

judge refused Maye's proposed instruction on heat-of-passion manslaughter because Maye denied killing Davis, and the judge found that there was no evidence in the record to support the instruction.

¶14. We review de novo the refusal of a lesser-included-offense instruction. *Franklin v. State*, 136 So. 3d 1021, 1026 (¶11) (Miss. 2014) (citing *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013)). A defendant is entitled to a lesser-included-offense instruction only when there is "evidence in the record from which a jury reasonably could find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense." *Id.* at 1027 (¶11) (quoting *Gilmore*, 119 So. 3d at 286 (¶13)). We will affirm the refusal of a lesser-included-offense instruction if—viewing the evidence in the light most favorable to the defendant, and drawing all reasonable inferences in his favor—no reasonable jury could have found the defendant not guilty of the indicted offense and yet guilty of the lesser-included offense. *Gilmore*, 119 So. 3d at 286 (¶13).

¶15. First-degree murder is a killing "done with deliberate design to effect the death of the person killed." Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2020). In contrast, heat-of-passion manslaughter is a "killing . . . without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense." *Id.* § 97-3-35. "Heat of passion" is defined as

> [a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from a grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the

7

time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Jones v. State*, 39 So. 3d 860, 866 (¶36) (Miss. 2010) (quoting *Mullins v. State*, 493 So. 2d 971, 974 (Miss. 1986)). The Mississippi Supreme Court has further stated:

> One of the primary elements of a heat-of-passion crime is immediate and reasonable provocation, by words or acts of one at the time. . . . [I]t is essential that the excited and angry condition of the party committing the act which would entitle him to the milder consideration of the law, should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation. . . . [T]here must not only be passion and anger to reduce a crime to manslaughter, but there must be such circumstances as would indicate that a normal mind would be roused to the extent that the reason is overthrown and that passion usurps the mind destroying judgment.

*Id.* at 866-67 (quotation marks and citations omitted).

¶16. To reduce a killing to manslaughter, "the impassioned reaction of the accused must have been reasonable: 'the passion felt by the person committing the act should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation.'" *Abeyta v. State*, 137 So. 3d 305, 310 (¶10) (Miss. 2014) (quoting *Agnew v. State*, 783 So. 2d 699, 703 (¶14) (Miss. 2001)). "[T]here must be such circumstances as would indicate that a normal mind would be roused to the extent that reason is overthrown and passion usurps the mind destroying judgment." *Agnew*, 783 So. 2d at 703-04 (¶14). "[S]uch an instruction should not be indiscriminately or automatically given." *Id.* at 703 (¶11). Moreover, "a heat-of-passion jury instruction is not warranted where a cooling-off period exists between the

provocation and the killing." *Sanders v. State*, 103 So. 3d 775, 779 (¶13) (Miss. Ct. App. 2012).

¶17. Maye cites *Haley v. State*, 123 Miss. 87, 85 So. 129 (1920), and *Nolan v. State*, 61 So. 3d 887, 894 (Miss. 2011), in support of his argument that the trial judge should have given his proposed instruction on heat-of-passion manslaughter. In *Haley*, Haley shot and killed Lewis Melvin as Melvin was sitting in the waiting room of a train station. *Haley*, 123 Miss. at 97, 85 So. at 129. On a Monday night, Haley's wife had told him that she had committed adultery with Melvin. *Id*. at 99, 85 So. at 130. Then on Tuesday night, Mrs. Haley told Haley that Melvin had bragged about having "illicit relations" with Haley's daughter, which "further enraged [Haley] so much so that he was weeping, wailing, tearing his hair, lying down, and then immediately getting up, praying, refusing to take nourishment, or sleep." *Id*. at 100, 85 So. at 130. Haley shot Melvin the following afternoon. Witnesses testified that Haley shot Melvin "amidst tears and lamentations—under feelings of great passion." *Id*. at 108, 85 So. at 133. The Court stated that "[a]ll of the testimony for [Haley] . . . tend[ed] to show that [he] was in a constant state of agitation from Monday night until Wednesday afternoon, and acted under great excitement at the time he fired the shot." *Id*. at 105, 85 So. at 132. Based on the evidence presented, the Supreme Court held that the jury reasonably found Haley guilty of heat-of-passion manslaughter. *Id.* at 108, 85 So. at 134.

¶18. In *Nolan*, Nolan was convicted of heat-of-passion manslaughter after shooting and killing his sleeping father. *Nolan*, 61 So. 3d at 889, 894 (¶¶1, 29). Nolan asserted an insanity

9

defense at trial and called several witnesses to testify in support of his defense. *Id.* at 889-90 (¶¶3, 5). Witnesses testified that Nolan was angry with his father for calling him a sexual deviant and that Nolan was "especially sensitive to such statements." *Id.* at 895 (¶¶32-33). Evidence showed "that Nolan had become obsessed with the notion that he had been accused of being a sexual deviant." *Id.* at (¶32). Nolan's conviction was supported by evidence of Nolan's lack of sleep on the days leading up to the shooting, his withdrawn and disturbed demeanor the day before the shooting, and his statements that he "acted out of emotion" and "couldn't control . . . the shooting." *Id.* (brackets omitted). Relying on *Haley*, the Court held that there was sufficient evidence that Nolan "was in a constant state of agitation" in the days leading up to the shooting and acted in the heat of passion. *Id.* at 894-95 (¶¶31-33).

¶19. *Haley* and *Nolan* are distinguishable from the present case. In each of those cases, the defendant's constant state of agitation in the time between a reasonable provocation and the killing supported a finding that he acted in the heat of passion as a result of immediate provocation. In this case, Maye argues that his constant state of agitation was the result of Davis's kicking him out of her home, dating another man, and introducing that man to M.D. But there is no evidence to support his claim. M.D.'s testimony regarding Maye and Davis's argument in their bedroom over another man on some day before the shooting is insufficient to support his contention because "words alone and disagreements among people are not enough to invoke the passion required for [heat-of-passion manslaughter]." *Phillips v. State*, 794 So. 2d 1034,1037 (¶10) (Miss. 2001). Moreover, Maye denied being angry at Davis for

dating another man and claimed that Davis never told him to move out of her home. On the day Davis was killed, Maye sent her text messages stating "I love you" and "I miss you."

¶20. No evidence in the record suggests that Maye killed Davis in the heat of passion or as a result of any sudden and sufficient provocation. When viewing the evidence in the light most favorable to Maye, no reasonable jury could find him not guilty of first-degree murder and yet guilty of heat-of-passion manslaughter. Therefore, the trial judge did not err by refusing to instruct the jury on the lesser offense.

## II.     The trial judge did not err by admitting the photograph.

¶21. Maye also argues that the trial judge erred by admitting a crime-scene photograph of Davis's face (Exhibit 49). At trial, the State moved to admit the photo into evidence, and Maye's counsel objected. Defense counsel argued that the photo should not be admitted because it was not probative and was inflammatory and designed to taint the jury. The State argued that the photo was "necessary to tell the entire story of how this crime developed" and to explain how the theory of the victim's death changed during the investigation. Particularly, the State noted that blunt-force trauma from a hammer was the initial theory of death, but the autopsy revealed that Davis died from a gunshot wound. The trial judge admitted the photo after finding that its "probative value . . . substantially outweigh[ed] any prejudice that [would] result [from its] admission."[4] The judge reasoned that the photo

_____

[4] The judge was not required to find that the probative value of photo substantially outweighed the risk of prejudice. Rather, evidence should be excluded under Rule 403 only if the danger of unfair prejudice substantially outweighs the probative value of the evidence.

11

would supplement and clarify witnesses' testimony and aid in describing the circumstances of the killing and the entry wound.

¶22.   We review a trial judge's decision to admit a photo into evidence only for an abuse of discretion. *Barfield v. State*, 22 So. 3d 1175, 1181 (¶14) (Miss. 2009). When the admission of photos is challenged on appeal, we "must consider whether the pictures were so gruesome and inflammatory as to lack any evidentiary purpose and, therefore, be inadmissable." *Id.* "[P]hotographs have evidentiary value when they (1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; and (3) supplement or clarify witness testimony." *Id.* at (¶15) (quotation marks omitted). "Some probative value is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence." *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019) (quoting *Chamberlin v. State*, 989 So. 2d 320, 340 (¶73) (Miss. 2008)). "So long as a photograph has probative value and its introduction serves a meaningful evidentiary purpose, it may still be admissible despite being gruesome, grisly, unpleasant, or even inflammatory." *Id.* (quoting *Dampier v. State*, 973 So. 2d 221, 230 (¶25) (Miss. 2008); *accord Morrison v. State*, 332 So. 3d 396, 401-02 (¶¶26-27) (Miss. Ct. App. 2022).

¶23.   Here, Exhibit 49 depicted the gunshot wound to Davis's head. The State introduced

---

M.R.E. 403; *Johnson v. State*, 204 So. 3d 763, 772 (¶30) (Miss. 2016) (Dickinson, P.J., concurring in part and in result). But the trial judge's misstatement of the test did not prejudice Maye and was harmless. *See Johnson*, 204 So. 3d at 772 (¶33) (Dickinson, P.J., concurring in part and in result).

12

the photo during Investigator Byrd's testimony about the course of law enforcement's investigation of the case. At that point in the trial, the claw hammer that investigators found in the woods had been admitted into evidence. After Exhibit 49 was admitted, Byrd testified that he initially believed that the hammer was the murder weapon. His mistake was based on his observations of the gunshot wound as depicted in Exhibit 49. Following the autopsy, Dr. LeVaughn determined that Davis died from a gunshot wound, not a blow from a hammer. The State did not attempt to admit any autopsy photos into evidence, and Exhibit 49 was the only photo of Davis admitted into evidence. The photo aided Byrd's and LeVaughn's testimony and clarified why Byrd initially thought the hammer was the murder weapon. Thus, the photo had some evidentiary value. Moreover, although the photo is unpleasant, it "do[es] not rise to the level of gruesomeness" previously deemed objectionable by our Supreme Court. *Martin*, 289 So. 3d at 707 (¶¶14-15).[5] In a murder trial, it is not unusual for crime-scene photos to be "gruesome, grisly, [or] unpleasant." *Martin*, 289 So. 3d at 705 (¶7). That alone will not render a photo inadmissible. *Id.* In this case, we conclude that the trial judge did not abuse his discretion by admitting Exhibit 49.

## CONCLUSION

---

[5] In *Martin*, the Supreme Court discussed *McNeal v. State*, 551 So. 2d 151, 159 (Miss. 1989), which held that the trial court abused its discretion by admitting a "full-color, close-up view of the [victim's] decomposed, maggot-infested skull," and *Bonds v. State*, 138 So. 3d 914, 920 (¶¶15-16) (Miss. 2014), which held that the trial court abused its discretion by admitting a "close-up, full-color photograph of the shooting victim's rotting [and maggot-infested] head," especially given that the photo "had little, if any, evidentiary value."

¶24.    Maye was not entitled to a heat-of-passion manslaughter instruction at trial because there was no evidence in the record to support the requested instruction.  In addition, the trial judge did not abuse his discretion by admitting Exhibit 49 over Maye's objection.  Therefore, Maye's conviction and sentence are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., GREENLEE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  McDONALD AND LAWRENCE, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**