## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2023-KA-00130-COA

**RICO DAVION SIMMONS A/K/A RICO SIMMONS**　　　　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/25/2023 |
| TRIAL JUDGE: | HON. GRADY FRANKLIN TOLLISON III |
| COURT FROM WHICH APPEALED | CALHOUN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/06/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**EMFINGER, J., FOR THE COURT:**

¶1.　After a trial by jury, Rico Davion Simmons was convicted of capital murder in the Circuit Court of Calhoun County, Mississippi, for killing Deundray Garth during the commission of a burglary. As a habitual offender, pursuant to Mississippi Code Annotated section 99-19-81 (Supp. 2018), Simmons was sentenced to serve life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. Simmons filed his notice of appeal.

### FACTS AND PROCEDURAL HISTORY

¶2.　Simmons and Wanya A. Harper were indicted by a Calhoun County grand jury for

capital murder. The indictment charged that Simmons and Harper killed Garth during the course of the burglary of Garth's dwelling house on September 17, 2020. The indictment was filed on March 2, 2021. Although they were jointly indicted, they were not jointly tried. Simmons's trial began on January 24, 2023. The State called six witnesses: Chrishandra Hatchett, Police Chief Ezra Conner, Wanya Harper, Ella Smith (Simmons' grandmother), Dr. David Arboe (medical examiner), and Tommy Bishop (forensic scientist). The defense called two witnesses: Julie Gonzalez and Brandon Walker.

¶3.     According to Hatchett, Garth resided with her and her five children at 121 Underwood Drive in Derma, Mississippi. She testified that when she woke up on the morning of September 17, 2020, Garth was still awake playing video games. He had been awake all night. Around 2:00 p.m., when Hatchett got ready to go to work, Garth was asleep with his head positioned at the foot of their bed.

¶4.     Hatchett left home around 3:40 p.m. for her shift at Sonic. Her two eldest children also left with her to work the same shift. Hatchett testified that she closed the door to her home when she left, which was her normal practice. She left her three younger children (ages 14, 13, 11) at home with Garth. According to Hatchett, it was common for the three children to go outside and play in the neighborhood while she was at work.

¶5.     During a break at 6:22 pm, Hatchett called Garth to talk and to ask if he wanted her to bring him home something to eat. Garth did not answer his phone. Hatchett did not think it was unusual for him to not answer because she thought he was still asleep. She got busy at work and did not attempt to call again.

¶6.     Hatchett and her two eldest children got off work at 9 p.m.  They made it home about 9:40 p.m.  Hatchett testified that her three youngest children were on the couch in the living room when she arrived.  She then went to her room to take Garth some food.  When she got in the room, Garth was lying face down, with his head still at the foot of the bed.  She set the drink down and noticed blood at the end of the bed.  Hatchett stepped back and called Garth's name several times.  When he did not answer, she leaned over his body and lifted him up.  At this point, she saw blood coming from his mouth.  Hatchett screamed for her daughter. Hatchett's first thought was that something had happened with Garth's stomach.  She said he complained a lot about his stomach.  Hatchett told her daughter, 20 years old at the time, to call 911. The operator asked if anyone could do CPR.  Hatchett did not know CPR, but she got a pillow, put it on the floor, and moved Garth to the floor.  She began pressing on his stomach, but she said that he had changed colors and that his body was already cold.

¶7.     Emergency medical technicians (EMTs) arrived and picked up Garth's body. Hatchett testified, "[O]ne of the EMT man's hand slipped from under his arm and he was, like, he got a hole in his arm." Hatchett asked the EMT about the hole, and the EMT told her it may have been a mole.  Hatchett told the EMT that Garth did not have a mole on his arm. The EMT then told Hatchett that something was not right or something was suspicious before loading Garth into the ambulance and driving him to the hospital.

¶8.     Once Garth arrived at the hospital, Garth's body had already been cleaned up by the coroner.  Hatchett was given the opportunity to examine Garth's body.  She testified that she

3

lifted his arm to look at the hole that the EMT had previously pointed out. The hole was located on the back of his arm. She then noticed a second hole located in his shoulder. She asked the coroner about the two holes. The coroner told Hatchett she did not know what caused the holes, but the doctor believed Garth had fallen onto something. Hatchett said there was nothing he could have fallen on that would have caused the holes, and she told the coroner she believed the holes were bullet holes. Garth's body was sent for an autopsy to be performed.

¶9.     After leaving the hospital, Hatchett received a phone call from someone stating that Rico Simmons had called his grandmother and told her that he had shot somebody. Hatchett notified law enforcement of the information she had received concerning Simmons.

¶10.     During cross-examination, Hatchett testified that when she came home from work, none of the three younger children seemed upset. One of her children went into the bedroom where Garth was sleeping while she was gone, but "he pulled the door back up and went back in the living room." Apparently, the child believed Garth was still sleeping. She was asked by the defense counsel if she knew Simmons before that day. She said she had not seen him in a long time. She knew his name but had never seen Simmons and Garth together. Hatchett also said she had never known Simmons to come to her house.

¶11.     Police Chief Ezra Conner of the Calhoun City Police Department testified that he was dispatched when Hatchett's daughter called 911. Conner testified that when he arrived on scene, the EMTs were putting Garth into the back of the ambulance. According to Conner, Garth was not alive at that point. Conner stated that he was not investigating a murder but

4

was there for crowd control. An EMT showed Conner a wound on Garth's left arm that could possibly be a small-caliber wound, but they were not sure.

¶12.    When the ambulance left, Conner went inside the house to see where Garth had been found.   Hatchett showed Conner where Garth's body was lying when she came home from work.   Conner noticed "a little pool of blood" at the foot of the bed.   He was still not investigating the scene for murder, but he did look around the room.   When asked if it looked like there had been any signs of a scuffle, Conner said, "[N]o."  Conner did not make contact with anyone else in the house.

¶13.    After leaving the house, Conner went to the hospital.  He spoke with a nurse and asked to see the wounds in Garth's arm.  Conner testified that the nurse gave his opinion to Conner that the wounds were either small caliber-wounds or sores, but was that it was unlikely to know at that point. When asked to describe Garth's wounds in court, Conner held up a ballpoint pen and indicated the tip of the pen as being the size of the hole.

¶14.    On direct examination, Conner stated that he did not begin a murder investigation regarding Garth's death until he received the phone call from Hatchett. Conner said that Hatchett told him, "Simmons was riding around, in a car, with a gun, saying he killed Mr. Garth." Although he was aware that sheriff's deputies later arrested Simmons, Conner had no further involvement in the investigation of Garth's death.

¶15.    The co-defendant, Wanya Harper, positively identified Simmons at trial.   Harper stated that he and Simmons had known each other for several years and went to high school together. Harper testified that on September 17, 2020, Simmons arrived at his house in a

5

grayish silver car belonging to Marty Boone. They left in Harper's car and were riding around when Simmons said he needed some money. Harper told Simmons that he needed some money, too, and told him where they might be able to get some "stuff." Harper did not think that anyone would be at Garth's house. Harper testified that they intended to commit a burglary, not a robbery. When they got to the house, Harper stayed in the car as a lookout. Simmons went inside. Harper testified that when Simmons got back in the car, "[Simmons] was, like, he woke up. We got to go." So, they left. About halfway back to Harper's house, Harper stated that Simmons started getting mad and saying basically the same thing over and over: "I don't fear no man. He got me f'd up." Once the two arrived at Harper's house, Simmons got out of Harper's car and got back in Boone's car. Harper went to Simmons to check on him. Simmons then told Harper, " [Y]ou know, in Detroit if somebody pull a gun on you, you take it." Simmons then showed Harper a .22-caliber revolver. Simmons then told Harper, "I'm fixing to take that. I need a new gun anyway." Harper gave Simmons a 9mm handgun with no clip and no bullets. Harper stated he was not even sure if the 9mm worked. He told Simmons, "[Y]ou need a new gun, just take this." They "smok[ed] a little weed" and "chilled" for about thirty minutes to an hour to try and get Simmons' mind off of what had happened.

¶16.    Harper had to leave to go babysit his sister's kids. He said he shook hands with Simmons, and then Simmons "took off real fast." While at work the following day, Harper started hearing rumors that Simmons was telling people that he (Simmons) had killed Garth. After work, Harper saw on an app that Simmons had been arrested in Boone's car. Later that

6

evening, Harper went to visit his godmother. He saw Simmons there and made small talk with him. Harper asked Simmons if he had shot Garth. Simmons told him, "[Y]eah, I shot him four times." Harper said they made a little more small talk and then did not see each other again until they were both in jail.

¶17.   Smith was the next witness for the State. Smith told the court that Simmons was her grandson. She was aware that Simmons had been charged with murder. Smith testified that Simmons called her around 10:30 that night and told her that he had killed someone. She asked him if it was "on that car?" He told her no, "I just shot a m***** f*****." She admitted that she had been drinking on the day that she received the phone call. At the time of the call, she believed that he was playing a joke on her. She told the jury that she did not realize until the next morning that somebody really got killed. Smith went to the sheriff's office to make an official statement on October 2, 2020, concerning the phone call from Simmons.

¶18.   During cross-examination, Smith testified that Simmons had come by her house on the day the murder took place. Simmons did not appear to her to be acting as if anything was upsetting him or that anything was wrong with him. He did not say anything about a shooting while at her house. They exchanged phone numbers before he left. Smith received the phone call from Simmons after he left. She was positive the caller was Simmons and could not have been anyone else.

¶19.   Day two of the trial began on January 25, 2023, and the jury returned to the courtroom to listen to Dr. Arboe testify via Zoom. The court was shown the photographs from the

autopsy as Arboe described each one. Arboe stated he found two gunshot wounds: one in the posterior upper arm and one in the left upper back. He was able to track the direction the bullets traveled and the injuries caused by the projectiles. The gunshot wound that entered Garth's back perforated or lacerated the left lung and then went through the heart before coming to rest in his chest cavity. Arboe then described recovering a bullet and bullet fragments from the left arm and chest cavity. Arboe identified his autopsy report, which was admitted into evidence. He determined the cause of death was a gunshot wound, and the manner of death was homicide.

¶20. The final witness called by the State was Tommy Bishop. As a forensic scientist and firearms and tool marking identification expert, Bishop testified that the bullet and bullet fragments retrieved from Garth's body had characteristics consistent with a .22-caliber firearm. He also testified that there was no possibility that the bullets could have been made by a 9mm bullet.

¶21. After the State rested in its case-in-chief, the defense moved for a directed verdict, which the trial court denied. Simmons then put on his defense, calling Julie Gonzalez and Brandon Walker as his witnesses. Gonzalez testified that Harper beat her on the night of September 17, 2020, and pulled a gun on her. He made her withdraw money from an ATM and give it to him. According to Gonzalez, Harper was acting frantic and saying that he had "done some bad s**t." She told the jury that Harper asked her to take Simmons to Memphis, but she refused.

¶22. The defense then called Walker, who told the jury that Harper called him on

September 17, 2020, and asked him to help with a robbery, but Walker refused. On cross-examination, Walker told the jury he is related to Simmons. Walker testified that he did not know anything about Garth's murder.

¶23. The defense and the State both rested their cases, and the jury was excused from the courtroom. The defense renewed its motion for a directed verdict, which the trial court denied.

¶24. The jury returned a unanimous verdict finding Simmons guilty of capital murder. Simmons was subsequently sentenced to life imprisonment in the custody of the MDOC as a habitual offender without eligibility for early release, probation, or parole.

## ANALYSIS

¶25. On appeal, Simmons contends that the evidence was legally insufficient, that the jury's verdict was against the overwhelming weight of the evidence, that the trial court erred by admitting gruesome autopsy photographs, and that the trial court erred by refusing his proposed jury instructions concerning reasonable doubt. We will address these issues separately below.

### I. Was the evidence legally insufficient?

¶26. Simmons argues, for the first time on appeal, that there was insufficient evidence of a "breaking" into Garth's house to support his conviction of capital murder. At the close of the State's case-in-chief, Simmons' counsel moved for a directed verdict, stating:

> Your Honor, if I might, at this time, I would like to make a Motion for Directed Verdict in favor of my client. I do not believe the State has presented a [prima facie] case against my client. I would ask the Court for a directed verdict of not guilty.

The trial court denied this motion. After the defense put on its case-in-chief, the State announced that it would finally rest. Simmons' counsel then renewed his motion for a directed verdict by stating:

> Your Honor, I would say the vast, vast majority of the evidence that the State is using against my client is hearsay, either from the co-defendant, or from others. There has been no gun admitted into evidence. There was much talk about a .22 revolver. I mean, it's just - - I just don't think the State has made a prima facie case against my client. I move for a Directed Verdict of not guilty on these findings.

The trial court denied this renewed motion. In Simmons' post-trial "Motion for Judgment Notwithstanding the Verdict or in the Alternative A New Trial," which was denied by the trial court, he did not raise the issue that the evidence was legally insufficient in any regard.

¶27.    Because Simmons' motions before the trial court did not specifically address the issue of a lack of evidence of a "breaking," we find that the trial court did not err by denying his motions. In *Carey v. State*, 80 So. 3d 131, 135 (¶12) (Miss. Ct. App. 2012), we stated:

> Carey asserts that the circuit court erred in denying his motion for a directed verdict based on the theory of imperfect self-defense. **Our supreme court has long held that a motion for a directed verdict must be specific in nature.** *Sheffield v. State*, 749 So. 2d 123, 126 (¶10) (Miss. 1999). **Furthermore, this Court has held that "[i]n the absence of such specificity, the [circuit] court will not be put in error for overruling [the] same." *Foster v. State*, 928 So. 2d 873, 879 (¶13) (Miss. Ct. App. 2005) (quoting *Davis v. State*, 866 So. 2d 1107, 1113 (¶21) (Miss. Ct. App. 2003)).** In neither his motion for a directed verdict nor his motion for a new trial or, alternatively, for a JNOV, did Carey specifically address the issue of imperfect self-defense or explain why he was entitled to a directed verdict based on self-defense. As such, he is procedurally barred from raising this issue on appeal.

(Emphasis added).

¶28.    As noted in *Carey*, because Simmons did not raise this issue at trial, he is procedurally

barred from raising the issue on appeal. In *Prather v. State*, 379 So. 3d 343, 350 (¶25) (Miss. Ct. App. 2023), we stated:

> As the State argues, defense counsel did not raise this precise issue before the trial court. Prather's counsel instead summarily moved "for a directed verdict on the grounds that the State has not met its burden of proof on the three charges of the indictment." Later, in the motion for judgment notwithstanding the verdict, Prather simply argued that the State "failed to prove every element of the crimes of aggravated assault[.]" In *Griffin*, we held, "[A] motion for a directed verdict on the grounds that the state has failed to make out a prima facie case must state specifically wherein the state has failed to make out a prima facie case. Motions for a directed verdict must be specific and not general in nature." [*Griffin v. State*, 269 So. 3d 337,] 350 (¶39) [(Miss. Ct. App. 2018)] (quoting *Sheffield v. State*, 749 So. 2d 123, 126 (¶10) (Miss. 1999)). As in this case, the defendant in *Griffin* argued on appeal that the State failed to prove the victim had suffered "serious bodily injury." *Id*. at 349 (¶38). We found the issue had been waived because defense counsel had only argued in the motion for directed verdict that "the State ha[d]n't met its burden by beyond a reasonable doubt." *Id*. at 350 (¶39). We likewise find that Prather is procedurally barred from raising this issue for the first time on appeal.

*See also Griffin*, 269 So. 3d at 350 (¶40); *Thomas v. State*, 195 So. 3d 843, 850 n.4 (Miss. Ct. App. 2016); *Rogers v. State*, 130 So. 3d 544, 547-48 (¶15) (Miss. Ct. App. 2013). Because Simmons did not specifically raise the issue of the insufficiency of the evidence to prove a "breaking" in his motion for a directed verdict at the conclusion of the State's case-in-chief, in his renewal of his directed verdict motion at the close of the evidence, or in his post-trial motion, this issue is procedurally barred from consideration on appeal.

¶29. Simmons' failure to raise this issue at trial is particularly important in the present case. Simmons' defense at trial was that Harper committed the murder, not that there was no evidence of a "breaking." In addition to counsel's failure to raise the issue as noted above, at no point during opening statements, during the examination of witnesses, or during closing

11

argument did Simmons' trial counsel point to a lack of evidence of a breaking. During the jury instruction conference, the State withdrew its proposed lesser-included-offense instruction for first-degree murder, *which would not have required proof of a burglary*. One must assume the State would not have withdrawn the lesser proposed instruction had the defense raised even the slightest challenge to the evidence of a burglary during trial.

¶30.    The dissent attempts to avoid this procedural bar by arguing a "plain error" analysis is required. Citing *Evans v. State* 919 So. 2d 231, 235 (¶14) (Miss. Ct. App. 2005), the dissent concludes that despite Simmons' failure to specifically raise this issue before the trial court, a plain error analysis is proper because he has a fundamental right to be convicted only upon proof beyond a reasonable doubt of each of the essential elements of capital murder. In a more recent case with the same name, *Evans v. State*, 372 So. 3d 167, 172 (¶14) (Miss. Ct. App. 2023), we identified the three elements necessary for applying "plain error":

> Applying the plain-error standard, this Court must determine "(1) whether the trial court deviated from a legal rule; (2) whether the error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial. Only if the error resulted in a manifest miscarriage of justice will reversal occur." *Collins v. State*, 305 So. 3d 1262, 1267 (¶19) (Miss. Ct. App. 2020) (quoting *Willie v. State*, 204 So. 3d 1268, 1279 (¶29) (Miss. 2016)).

Further, in *Starks v. State*, 798 So. 2d 562, 566-67 (¶15) (Miss. Ct. App. 2001), this Court pointed out that this procedural bar had been applied in a similar situation to the case at bar:

> We find the need for specificity to have been relied upon in situations in which **a narrow and not altogether obvious deficiency is suggested on appeal**. *E.g.*, *Sheffield v. State*, 749 So. 2d 123, 126 (Miss.1999) (in burglary appeal argued that no proof offered that the building was a "dwelling"; at trial did not make that argument).

(Emphasis added). Without the defense raising the issue of "breaking" at some point during

12

the trial and without the trial court hearing argument from both the defense and the State on this issue, it would not have been "plain, clear and obvious" to the trial court that there was any question regarding the proof of a "breaking." As in *Sheffield*, the evidence of a breaking, or lack thereof, "was a narrow and not altogether obvious deficiency;" therefore, we find the trial court did not commit plain error by denying Simmons' motions.[1]

¶31. In any event, Harper testified that he and Simmons went to Garth's residence to commit a burglary. They wanted to steal some personal property that they could sell and make some money. Harper said they intended to commit a burglary, not a robbery, because they did not expect anyone to be in the house. Harper testified that Simmons went into the house. When Simmons came back out, he told Harper that Garth woke up, and he had to get out of there. The evidence shows that Simmons later told both his own grandmother and Harper that he killed Garth.

¶32. In *McLain v. State*, 317 So. 3d 33, 36 (¶14) (Miss. Ct. App. 2021), a similar case concerning the sufficiency of the evidence of a "breaking," this Court explained:

> As the State notes, *Harris* [*v. State*, 68 So. 3d 754 (Miss. Ct. App. 2011),] is analogous to this case. In *Harris*, the defendant argued there was insufficient evidence of a breaking into a shed. [*Id.*], at 757 (¶10). However, the burglary victim testified that he always kept the door shut, although it may not always be locked. *Id.* at (¶12). We found that evidence the door is usually shut was sufficient to prove the "breaking" element under *Wheeler*, supra, and affirmed the conviction. *Id.* at (¶¶11, 13). Likewise, here East testified that he usually

---

[1] Had the defense raised this issue at trial, the trial judge could have heard arguments from both sides on the issue, considered the evidence admitted at trial, and made a ruling. Had the judge ruled for the defense, the case likely could have proceeded on the lesser-included first-degree murder charge. Even if the court had denied a directed verdict motion, the State almost certainly would not have withdrawn the proposed first-degree murder instruction.

kept the door to his home closed, which is sufficient to prove McLain's entry into the home was a "breaking."

In the present case, Hatchett testified that she actually closed the door when she left for work, as she normally did.

¶33. The jury was properly instructed as to the elements of burglary and specifically instructed:

> Breaking into, as that term is used in this case, means any act or force, however slight, used to enter through any usual or unusual place of entry, whether open, partly open, or closed.

The twelve jurors unanimously found beyond a reasonable doubt that Simmons broke into Garth's house and killed him in the course of a burglary.

¶34. In *Eubanks v. State*, 341 So. 3d 896, 909-10 (¶41) (Miss. 2022), the supreme court repeated the familiar standard of review concerning the legal sufficiency of the evidence to support a jury's conviction:

> "When reviewing a challenge for sufficiency of the evidence, this Court must determine whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Naylor v. State*, 248 So. 3d 793, 796 [(¶8)] (Miss. 2018) (internal quotation marks omitted) (quoting *Ambrose v. State*, 133 So. 3d 786, 791 [(¶16)] (Miss. 2013)). "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id*. (internal quotation marks omitted) (quoting *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)).
>
> > [I]f a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.

*Id*. (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)). While we must view the evidence and all the reasonable inferences that can be drawn therefrom in the light most favorable to the verdict, *we must also disregard all evidence favorable to the defendant*. *See Parish v. State*, 176 So. 3d 781, 786 (¶17) (Miss. 2015); *Moore v. State*, 996 So. 2d 756, 760-61 (¶12) (Miss. 2008); *Withers v. State*, 907 So. 2d 342, 352 (¶29) (Miss. 2005); *White v. State*, 722 So. 2d 1242, 1246 (¶21) (Miss. 1998).

¶35. It was reasonable for the jury to infer that the three children had left the house before the events leading to Garth's death occurred but returned after he was killed. Further, based upon the above authorities and the testimony in this case, it was reasonable for the jury to draw the inference from the evidence that the door to the residence was closed, that Simmons broke into the house to steal, and that he then killed Garth in the process. When viewing the evidence as required by *Eubanks*, notwithstanding the procedural bar, we find the evidence is legally sufficient to prove a "breaking." This issue is without merit.

**II.    Was the verdict against the overwhelming weight of the evidence?**

¶36. Under this assignment of error, Simmons simply argues that should this Court find that the evidence of a breaking was legally sufficient, then the verdict was against the overwhelming weight of the evidence. Our standard of review for this issue is set forth in *Owens v. State*, 383 So. 3d 305, 309 (¶19) (Miss. 2024):

> Unlike a motion for a directed verdict or J.N.O.V., appellate courts review the grant or denial of a motion for new trial for an abuse of discretion. *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017). Abuse of discretion is an appellate court's most deferential standard of review. In carrying out our review, "we weigh the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence

15

that to allow it to stand would sanction an unconscionable injustice.'" *Id*. (alteration in original) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)). "Any less stringent rule would denigrate the constitutional power and responsibility of the jury in our criminal justice system." *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983).

Based upon the evidence in this case as set forth above and our analysis of the legal sufficiency of the evidence, we find that the jury's verdict was not "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." This issue is without merit.

### III. Did the trial court err by admitting gruesome autopsy photographs?

¶37. Simmons contends that the trial court erred by admitting, over the defense's objection, three photographs:

(1) a photo of Garth's lung removed from his body and sitting on a table;
(2) a photo of Garth's heart removed from his body and sitting on a table; and
(3) a photo of Garth's torso "splayed open" with his organs and insides exposed.

Simmons argues that any probative value of these photographs was substantially outweighed by the danger of unfair prejudice to Simmons. Simmons maintains that his defense at trial was that Harper acted alone to kill Garth. He argues that he did not dispute that Garth was killed by a .22-caliber bullet to the back. He submits that "Garth's identity and manner and cause of death were established and not disputed." In support of his argument, he cites *Sudduth v. State*, 562 So. 2d 67, 70 (Miss. 1990), where the court stated:

However, photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established. *Davis* [*v. State*], 551 So. 2d [165,] 173 [Miss. 1989]; *Shearer v. State*, 423 So. 2d 824, 827 (Miss.

16

1982).

¶38.	The State counters by citing *Dampier v. State*, 973 So. 2d 221, 230 (¶25) (Miss. 2008), where the court stated:

> So long as a photograph "has probative value and its introduction serves a meaningful evidentiary purpose[,]" it may still be admissible despite being "gruesome, grisly, unpleasant, or even inflammatory." *Id*. (citations omitted).

There was much testimony during the trial concerning the nature of Garth's wounds. The EMTs did not know whether there was a hole in Garth's arm or whether it was a mole. The coroner told Hatchett that the doctor believed that the holes were caused by Garth falling on something. The chief of police minimized the extent of the injury he saw by stating that it was about the size of the end of a ballpoint pen. The State argues that these three photographs aided Dr. Arboe in describing for the jury Garth's injuries that caused his death. The State also argues that the photos, while not pleasant, were not so "overly gruesome, prejudicial, or inflammatory to bar their admission."

¶39.	The trial court overruled Simmons' objection to the photographs, finding that they were part of the "medical findings of the cause of death and part of the autopsy report as represented by the State." The record shows that Dr. Arboe used the photos during his testimony. He testified that the "round entered the back, it then perforated or lacerated the left lung, as well as the heart, before resting in the chest cavity." Exhibit 7 showed the gunshot wound "through the left lower level of the left lung." He testified that the round then went to the heart. Exhibit 8 was used for Dr. Arboe to show the bullet holes in the heart. Dr. Arboe explained that Exhibit 9 shows him recovering the bullet from the chest cavity.

17

¶40.    In *Smith v. State*, No. 2021-KA-01003-COA, 2023 WL 2884723, at *10 (¶31) (Miss.

Ct. App. Apr. 11, 2023), *aff'd*, 2024 WL 2971351 (Miss. June 13, 2024), this Court held:

> A trial court judge has nearly "unlimited" discretion when determining if
> photographs can be admitted into evidence, "regardless of the gruesomeness,
> repetitiveness, and the extenuation of probative value." *Martin v. State*, 289
> So. 3d 703, 705 (¶7) (Miss. 2019) (quoting *Dampier v. State*, 973 So. 2d 221,
> 230 (¶25) (Miss. 2008)). "Even if the photograph is gruesome, grisly,
> unpleasant, or even inflammatory, it still may be admitted so long as it has
> probative value and its introduction serves a meaningful evidentiary purpose."
> *Id.* (emphasis added) (quoting *Beasley v. State*, 136 So. 3d 393, 400 (¶21)
> (Miss. 2014)). A photograph is considered to have a meaningful evidentiary
> purpose if it helps describe the "circumstances of the killing, describes the
> location of the body and cause of death, or supplements or clarifies witness
> testimony." *Beasley*, 136 So. 3d at 400 (¶24).

In the present case, the photos were not particularly gruesome or inflammatory and were

clearly used to supplement or clarify the testimony of Dr. Arboe as to the cause and manner

of Garth's death. We find that the trial court did not abuse its discretion by the admission of

the photographs.

### IV.    Did the trial court err by refusing Simmons' proposed instructions on reasonable doubt?

¶41.    While Simmons acknowledges that "[o]ur supreme court has repeatedly stated that the

term 'reasonable doubt' defines itself and is not a proper jury instruction," he argues that the

trial court erred by denying instructions D1 and D2, his proposed jury instructions on

reasonable doubt. *Vaden v. State*, 965 So. 2d 1072, 1074 (¶4) (Miss. Ct. App. 2007).

Simmons' proposed instruction D1 stated:

> The Court instructs the jury that you are bound, in deliberating upon this case,
> to give the defendant the benefit of any reasonable doubt of the defendant's
> guilt that arises out of the evidence or the want of evidence in this case. There
> is always a reasonable doubt of the defendant's guilt when the evidence simply

makes it probable that the defendant is guilty. Mere probability of guilt will never warrant you to convict the defendant. It is only when, on the whole of the evidence you are able to say on your oaths, beyond a reasonable doubt, that the defendant is guilty that the law will permit you to find him guilty. You might be able to say that you believe him to be guilty, and yet, if you are not able to say on your oaths, beyond a reasonable doubt, that he is guilty, it is your sworn duty to find the defendant "Not Guilty."

His proposed jury instruction D1 is almost verbatim to the instruction the court refused in

*Thompson v. State*, 230 So. 3d 1044, 1052 (¶¶25-26) (Miss. Ct. App. 2017), where this Court

stated:

> In *Fulgham v. State*, 46 So. 3d 315 (Miss. 2010), the Supreme Court held that a substantively identical instruction was an improper "attempt[ ] to define 'reasonable doubt.'" *Id*. at 332 (¶ 46). **The Court explained that it "has long held that a definition of reasonable doubt is not a proper instruction for the jury; 'reasonable doubt defines itself.'"** *Id*. (alteration omitted) (quoting *Barnes v. State*, 532 So. 2d 1231, 1235 (Miss. 1988)). The *Fulgham* Court held that the trial judge did not abuse his discretion by denying the very same reasonable doubt instruction at issue here. *Id*. It follows that the trial judge in this case did not abuse his discretion by denying proposed instruction D-2.

(Emphasis added). We find that the trial court did not abuse its discretion by refusing to give

Simmons' proposed jury instruction D1.

¶42.    Also, instructions identical to Simmons' proposed jury instruction D2 have been

repeatedly denied by the courts. Simmons' proposed instruction D2 would have told the jury:

> The Court instructs the jury that a reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of evidence, or the insufficiency of the evidence, but however it arises, if it arises, it is your sworn duty to find the defendant "Not Guilty."

In *Goode v. State*, 374 So. 3d 592, 608 (¶41) (Miss. Ct. App. 2023), this Court stated:

> Goode offered instruction D-2, which would have instructed the jury that "reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of the evidence; but however it arises, if it arises, it is your

19

sworn duty to find the Defendant ['] Not Guilty.[']" In refusing this instruction, the trial court relied on *Lafayette v. State*, 90 So. 3d 1246 (Miss. Ct. App. 2011), *rev'd*, 90 So. 3d 1215 (Miss. 2012). The trial court also indicated that it relied on "a number of cases prior" and found D-2 "to be an improper instruction . . . an improper comment or an attempt to define reasonable doubt." **The Mississippi Supreme Court has repeatedly and consistently asserted that "[r]easonable doubt defines itself."** *Lett v. State*, 902 So. 2d 630, 638 (¶27) (Miss. Ct. App. 2005) (citing *Martin v. State*, 854 So. 2d 1004, 1009 (¶12) (Miss. 2003); *Chase v. State*, 645 So. 2d 829, 851 (Miss. 1994); *Williams v. State*, 589 So. 2d 1278, 1280 (Miss. 1991)). **Further, in *Berry v. State*, 859 So. 2d 399, 404 (¶17) (Miss. Ct. App. 2003), this Court stated that it was proper to refuse a jury instruction defining reasonable doubt because the instruction was "superfluous."** We find no error.

(Emphasis added). We find that the trial court did not abuse its discretion by refusing Simmons' proposed jury instruction D2 concerning reasonable doubt. This assignment of error is without merit.

## CONCLUSION

¶43. Finding no reversible error, we affirm Simmons' conviction and sentence for capital murder as a habitual offender.

¶44. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.**

**WESTBROOKS, J., DISSENTING:**

¶45. In the case sub judice, the State failed to present sufficient evidence to prove the breaking element of burglary, which was necessary to obtain the capital murder conviction. However, the majority deflects from the State's shortcomings and holds that the issue was not properly preserved for appellate review because Simmons failed to make specific

20

arguments regarding the breaking element in his motion for a directed verdict before the trial court. Our system of justice does not comport with the State's obtaining a conviction using insufficient evidence while, in the same breath, demanding that the defense make specific arguments in a motion for a directed verdict to preserve specific issues for appeal. While our precedent embodies that dogma, there is something painfully ignominious about that rationale in criminal appeals. We cannot hold the criminal defense bar to a standard of specificity and not hold the State (which carries the burden) to the exact same standard when presenting its case-in-chief. Even when viewing the evidence in the light most favorable to the State without considering any evidence favorable to the defendant, I do not believe the State presented sufficient evidence to prove the breaking element necessary in a burglary offense that would sustain a capital murder conviction under Mississippi Code Annotated section 97-3-19(2)(e), and no rational juror could find such proof beyond a reasonable doubt.[2] While the issue of breaking was not raised post trial by Simmons, I deem that we should review the issue using a plain-error analysis. Lack of specificity in the defendant's motion for a directed verdict does not waive the State's obligation to prove each element of an offense beyond a reasonable doubt. Therefore, I respectfully dissent.

¶46. Harper testified that he and the defendant rode with one another to the victim's home. On the way there, Simmons spoke to Harper about getting items from there "like a game

---

[2] Burglary is defined under Mississippi statutory law as "breaking and entering the dwelling house or inner door of such dwelling house of another, whether armed with a deadly weapon or not, and whether there shall be at the time some human being in such dwelling house or not, with intent to commit some crime therein . . . ." Miss. Code Ann. § 97-17-23(1). Again, I would find the State failed to present sufficient evidence of a breaking.

[system], a TV, [and] some shoes." Harper testified that they hatched this plan to rob Garth because they did not have any money and were just looking for "something you can s[ell]." When they arrived at the house, Harper stayed in the car because he was too scared to go inside. Harper's testimony, while it placed Simmons at the scene, failed to indicate that Harper saw Simmons enter the home. The record failed to reveal how Simmons gained entry inside the house. Harper did not provide any testimony that he heard gunshots while he was waiting in the car. He also did not testify that he saw any children outside the home. Simmons returned to the car where Harper was waiting and told him, "He woke up. We got to go." They left and drove back to Harper's house.

¶47.    Once they returned to Harper's home, Simmons got out of the car, slamming the door. He walked and got inside another car belonging to Marty Boone. Simmons, who was previously "fuming and talking crazy" in the car, was still doing the same thing inside Boone's car. Harper walked up to the car and saw Simmons pull out a .22-caliber revolver. This firearm is the only physical evidence that connects Simmons to the crime because it is consistent with the characteristics of the bullets found in Garth's body. While inside Boone's car, Simmons stated, "I'm fixing to take that. I need a new gun anyway." It was then that Harper gave Simmons a 9-millimeter gun that had no clips or bullets. According to Harper, he told Simmons, "We're just going to leave that alone. We're not, you know forget that." Afterward, the two went inside Harper's home and "smok[ed] a little weed" and "chilled" for at least an hour. According to Harper, they smoked and made small talk to get Simmons' mind off of it. Harper testified he and Simmons did that until he had to go babysit for his

22

sister. It was then that he and Simmons shook hands, and Simmons drove off from his home. This sequence of events took an hour at the very least and, thus, was not an immediate turn-around between the first time Simmons went to Hatchett's home and the second time.

¶48. When Harper saw Simmons the following day, he asked him if he went "back down there" to Hatchett's home, and Simmons admitted, "[Y]eah, I shot him four times." It is clear from Harper's testimony that the killing of Garth did not occur until Simmons returned to Hatchett's home a second time after he and Harper parted ways. It is also clear that he went without Harper. The record establishes that Simmons went back and killed Garth after he left Harper's home. Again, it is not clear from the record that Simmons killed Garth after allegedly breaking into the house the second time he was there.

¶49. In evaluating Hatchett's testimony, the evidence is wholly insufficient to prove that Simmons "broke" into the house when he killed Garth. The jury heard Hatchett say that she normally locks the door behind her and that she had closed the door when she left for work on the day of the incident. She did not say she "actually" closed the door, as mentioned in the majority opinion. (Maj. Op. ¶32). She did state that while she went to work with the two older children, her younger children—ages 11, 13, and 14—were left at the house. She also testified that while she is at work, they "run around . . . all outside and playing." She further stated that it is common for them to leave her house every day. She went on to state that her children were on the couch in the living room when she returned. The majority opinion adds that "it was reasonable for the jury to infer that the three children had left the house before the events leading to Garth's death but returned after he was killed." (Maj. Op. ¶35).

23

Hatchett testified that she was gone that day from approximately 3:40 p.m. to 9:40 p.m. That is a six-hour window in which anyone who was inside the home could have gone out and come in again. In addition, Hatchett confirmed that there was no damage to the home and that her three children who were left at home that day did not see or hear anything or seem upset. There was no evidence that the children closed or routinely closed the door.

¶50. Capital murder is defined by Mississippi's statutory law as a killing that occurs

> with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies[.]

Miss. Code Ann. § 97-3-19(2)(e). This subsection "does not require the prosecution to prove the elements of murder, only that a killing took place while the accused was engaged in the commission of the enumerated felon[y]." *Ronk v. State*, 172 So. 3d 1112, 1126 (¶23) (Miss. 2015) (internal quotation marks omitted). This point is particularly relevant here because the State chose to *not* prosecute Simmons for first-degree murder or its lesser-included offenses (e.g., manslaughter)[3] and took the risk to pursue a conviction for capital murder, or no murder at all. *See Black v. State*, 377 So. 3d 1036, 1039-40 (¶¶17-20) (Miss. Ct. App. 2024).[4]

_____

[3] *See Shumpert v. State*, 935 So. 2d 962, 968 (¶16) (Miss. 2006) (citing *State v. Shaw*, 880 So. 2d 296, 304-05 (Miss. 2004); *Fairley v. State*, 871 So. 2d 1282, 1284-85 (Miss. 2003)).

[4] The record revealed that the State introduced a jury instruction for the lesser offense of first-degree murder (S-2) and another jury instruction for deliberate-design murder (S-5); however, without explanation or reason, the State withdrew both of these instructions during the jury charge conference. That decision deprived us of the option to remand this case back

¶51. Initially, though, I address the majority's position that the issue is procedurally barred for lack of specificity in Simmons' directed verdict motion and that Simmons should have specifically raised the issue of insufficiency of the evidence to prove a "breaking" in his motion for a directed verdict for it to be considered on appeal.

¶52. While Simmons did not explicitly argue the lack of the "breaking" element in his motion for a directed verdict, he submitted a clear peremptory instruction (D-2) specifically apprising the court of the "lack of evidence" and the "insufficiency of the evidence" in the case, but the court refused to give the jury this instruction. Although Simmons did not raise this precise point, our precedent clearly denotes that by refusing the instruction, the trial court committed reversible error. *E.g.*, *White v. State*, 441 So. 2d 1380, 1381 (Miss. 1983) ("[W]e notice the plain error committed by the lower court in refusing to grant the peremptory

---

to the circuit court for resentencing because the mens rea element of capital murder is not necessarily an element of the other statutory homicides. Based on Simmons' words and actions with Harper, the State could have established malice. If the State believed that it could not prove malice, then misdemeanor homicide under Mississippi Code Annotated section 97-3-29 (Rev. 2020) was available; the record unequivocally shows that Simmons trespassed into Hatchett's home and committed a homicide while inside. Like felony murder, misdemeanor homicide does not require malice.

In my view, the State should have proposed an instruction allowing the jury to consider this type of manslaughter, and it would have yielded a conviction I would not dispute based on the facts in the record. In reality, the State chose the convenient route here and prosecuted Simmons for capital murder, which yields a broader ground for conviction than the others mentioned. It is a crime that requires no evidence of an intent to kill. Under section 97-3-19(2)(e), felony murder requires proof of the encompassing element of burglary (i.e., breaking into the house), which here was based on insufficient evidence. No reasonable juror could examine the evidence in this case and say *beyond a reasonable doubt* that Simmons broke into that house. A juror might be able to say Simmons *more likely than not* broke into the house, but this was not a civil trial. The State's burden was one of proof beyond a reasonable doubt, and the State chose to try to prove capital murder. Simmons was sentenced to serve the remainder of his life in prison with no eligibility for parole despite the State's failure to meet that burden.

instruction for appellant." (citing *McMullen v. State*, 291 So. 2d 537, 540-41 (Miss. 1974) (reversing even though "defendant made no objections to the instructions offered" because "it affirmatively appears from the whole record that very likely there has been a miscarriage of justice"))).

¶53.   Even assuming the issue presents a procedural barrier, we should remove it, as we often do, and review for plain error because the State has secured a conviction of one of the heaviest crimes using only the barest speculative evidence to substantiate a finding that could not be made beyond a reasonable doubt.  The majority points to *Starks v. State*, 798 So. 2d 562 (Miss. Ct. App. 2001), as precedent for applying a procedural bar for Simmons' alleged lack of specificity at trial. I rely on *Starks* as well, except I turn to its holding instead of its dicta: this Court *did not* apply the procedural bar in *Starks*, holding that "the need for specificity to have been relied upon" was for "situations in which a narrow and not altogether obvious deficiency is suggested on appeal." *Id.* at 566 (¶15).

¶54.   Our Court has held that "[t]he defendant's failures are not the basis for our determining whether to notice as plain error a matter not brought to the attention of the trial court or an issue not addressed on appeal.  We must consider whether a substantial right is involved.  If the error affects a fundamental constitutional right, plain error recognition is appropriate." *Evans v. State* (*Y. Evans*), 919 So. 2d 231, 235 (¶14) (Miss. Ct. App. 2005). "Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right. "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest

26

miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Burdette v. State*, 110 So. 3d 296, 303 (¶23) (Miss. 2013).

¶55.    The majority's reliance on this Court's more recent decision of *Evans v. State* (*M. Evans*), 372 So. 3d 167 (Miss. Ct. App. 2023), is misplaced and, in fact, lends support for my conclusion.  In that case we maintained that "[a] constructive amendment of the indictment occurs when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Id.* at 172 (¶15). There, the defendant argued that a jury instruction (P-3) the court gave on "attempted statutory rape" constructively amended his indictment.  Because his trial counsel failed to object to the jury instruction, he had to seek plain-error review on appeal, but we found none. *Id.* at (¶17).  The basis for the given jury instruction did not support a separate crime of "'attempted statutory rape' *or a broader ground for conviction*," and we found no plain error. *Id.* (emphasis added).

¶56.    Here, Simmons was convicted on the *broader* ground of capital murder and sentenced to life in prison without parole eligibility; however, the evidence the State used to prove his guilt was actually in accord with the proof required for culpable-negligence manslaughter under Mississippi Code Annotated section 97-3-29, which carries a maximum sentence of twenty years in custody.  Miss. Code Ann. § 97-3-25 (Rev. 2020).  Unlike in *M. Evans*, Simmons faced not only our *broadest* murder charge but also our heaviest punishment besides death. *See supra* n.4.  The majority further makes my point in discussing *M. Evans*

27

because a defendant is not weighted with the responsibility to make an argument toward a conviction. The defense is not responsible for the State's choice of *its* proposed jury instructions. One can also assume that by even drafting and initially offering the instruction, the State at least recognized that it had a problem with proving that a burglary occurred.

¶57. "It is not open to reasonable debate that the right not to be convicted of an offense unless the State proves beyond a reasonable doubt each and every element of the offense is a fundamental right anchored in our constitution and the jurisprudence of this state." *Y. Evans*, 919 So. 2d at 235 (¶15) (dashes omitted). Therefore, "we see no reason why a defendant's failure to object to the State's failure to prove and present instructions on an essential element of the offense[ ] ought to waive the State's failure to meet its burden." *Id*. This Court in *M. Evans* perfectly iterated that the right not to be convicted unless the State proves each element beyond a reasonable doubt is a fundamental right steeped in the framework of our criminal justice system. Here, the breaking element of burglary to support the capital murder conviction was not proved. *Cf. Hughes v. State*, 291 So. 3d 792, 797 (¶¶10-12) (Miss. 2020) ("The crime of burglary has two essential elements, the unlawful *breaking* and entering and the intent to commit some crime once entry has been gained. The essential element of breaking and entering is missing from the record[,] . . . [and] [c]onsidering the evidence in the light most favorable to the State, we . . . cannot permit a conviction to stand based merely upon suspicion." (citation omitted)). The majority believes that there is no plain, clear, or obvious error. I disagree for the reasons I just mentioned. I believe the plain-error review standard should be applied to prevent a miscarriage of justice.

¶58. Turning to the merits, when reviewing a sufficiency-of-the-evidence argument, we ask whether, after "viewing the evidence in the light most favorable to the State and giving the State the benefit of all favorable inferences reasonably drawn from the evidence, any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Chisholm v. State*, 365 So. 3d 229, 245 (¶66) (Miss. 2023) (citing *Williams v. State*, 285 So. 3d 156, 159 (Miss. 2019); *Martin v. State*, 214 So. 3d 217, 222 (Miss. 2017); *Hughes v. State*, 983 So. 2d 270, 276 (Miss. 2008)). We are not required to decide—and in fact, we must refrain from deciding—whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did. *Allen v. State*, 309 So. 3d 453, 455 (¶8) (Miss. Ct. App. 2019) (citing *Lenoir v. State*, 222 So. 3d 273, 278 (¶25) (Miss. 2017)). This Court "must [also] reverse and render 'if the facts and inferences so considered point in favor of the defendant on *any* element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.'" *Ward v. State*, 285 So. 3d 136, 140 (¶14) (Miss. 2019) (quoting *Henley v. State*, 136 So. 3d 413, 415-16 (Miss. 2014)). "All the proof need not be direct and the jury may draw any reasonable inferences from all the evidence in the case." *Fontenot v. State*, 287 So. 3d 322, 326 (¶18) (Miss. Ct. App. 2019) (quoting *Campbell v. State*, 278 So. 2d 420 (Miss. 1973)) (citing *Woodward v. State*, 180 Miss. 571, 178 So. 469, 471 (1938)). Here, Simmons challenges the legal sufficiency of the evidence employed to convict him.

¶59. In another case recently brought before this Court, we found that there was insufficient evidence to support a conviction for culpable-negligence manslaughter. *Fox v.*

29

*State*, 378 So. 3d 1007, 1029 (¶74) (Miss. Ct. App. 2024). In *Fox*, the majority stated that "[t]he elements of the crime must be proved beyond a reasonable doubt by the evidence and not mere 'guesswork, speculation and conjecture.'" *Id*. at 1015-16 (¶23) (citing *Edwards v. State*, 469 So. 2d 68, 69 (Miss. 1985)). Further, we stated that a "[c]onviction in criminal cases must rest upon finite evidence and not probabilities or surmise." *Id*. at 1016 (¶23) (quoting *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974)). The same reasoning applies here.

¶60. "A capital murder conviction under [subsection 97-3-19(2)(e)] must be supported by evidence legally sufficient to support a conviction of *both the murder and the underlying felony*, had either been charged alone." *Hughes v. State*, 90 So. 3d 613, 629-30 (¶48) (Miss. 2012) (citation omitted) (emphasis added). To reiterate, the elements of burglary of a dwelling are "(1) '*breaking* and entering the dwelling house or inner door of such dwelling house of another' . . . (2) 'with intent to commit some crime therein.'" *Quinn v. State*, 191 So. 3d 1227, 1233 (¶22) (Miss. 2016) (emphasis added) (quoting Miss. Code Ann. § 97-17-23(1) (Rev. 2014)). In the instant case, the State failed to show how the evidence allows a rational juror to be convinced beyond a reasonable doubt that Simmons "broke" into Hatchett's house. *Cf. Edwards*, 469 So. 2d at 69 (explaining all elements must be proved beyond a reasonable doubt by the evidence and not with "guesswork, speculation and conjecture").

¶61. According to our caselaw, "[t]o constitute burglary, a 'structure must generally be closed. Otherwise the entry is merely a trespass, not a breaking and a burglary.'" *McLain v. State*, 317 So. 3d 33, 35 (¶9) (Miss. Ct. App. 2021) (quoting *Foster v. State*, 281 So. 3d 229,

233 (¶11) (Miss. Ct. App. 2019)). "[A] breaking is conducted by an act of force, regardless of how slight, necessary to be used in entering a building, such as turning a knob, a slight push to further open a door, or raising a latch." *Id*. (quoting *Foster*, 281 So. 3d at 233 (¶11); *Ladd v. State*, 87 So. 3d 1108, 1114 (¶19) (Miss. Ct. App. 2012)). "Even if the door was unlocked or if only slight force was needed to gain entry, such entry has been viewed as forcible for the purposes of our burglary statute." *Id*. (quoting *Harris v. State*, 68 So. 3d 754, 757 (¶11) (Miss. Ct. App. 2011); *Wheeler v. State*, 826 So. 2d 731, 735 (¶12) (Miss. 2002)). Both *McClain* and *Harris* offer illustrations.

¶62.   In *McLain*, the defendant argued that the State failed to prove that a "breaking" had occurred because the State did not present any evidence that all the doors and windows were closed before leaving the house. *Id*. at (¶10). We reasoned that the evidence was sufficient because "the State did present evidence that the door was closed on the date of the incident" through the testimony of the resident that he "normally locks his door" and that he did not leave the door "wide open." *Id*. at 35-36 (¶12).

¶63.   In *Harris*, the defendant made a similar argument by asserting that the State failed to present evidence that "he opened the door" to a storage room attached to a house. *Harris*, 68 So. 3d at 757 (¶10). We explained that because the jury had heard testimony that the door was usually closed, that a "toolbox was missing," and that a shelf "had been knocked over," the jury could have believed that the defendant had opened the closed door. *Id*. at 757 (¶¶12-13).

¶64.   *McLain* and *Harris* are distinguishable from the case before us because Hatchett's

31

testimony introduces an "x" factor not present in *McLain* or *Harris*. While Hatchett testified she locked the door, as she normally did, she also testified as to what her children may have done. She conveyed that her younger children leave the house while she is at work. She stated that it was normal for her kids to go in and out of the house while she was gone. The majority tries to offer water for chocolate by stating that Hatchett's testimony created an inference, but, in fact, it was nothing more than an assumption or guesswork. No testimony was presented to show what either of the younger children did that day. There is no evidence in the record that clearly conveys that the children closed the door when they went outside that day. There certainly was no evidence that they went outside the house and closed the door behind them, allowing a "breaking" to occur later. It is clear that Simmons was inside, but we do not know "how" he got inside—and we are not free to speculate.

¶65.    A better case for guidance here is *Rankin v. State*, 214 So. 2d 811, 812-13 (Miss. 1968). In *Rankin*, the testimony of the claimant, who had seen someone in her bedroom, did not give any positive assurance of how entry was gained into her house—let alone by the defendant. The supreme court reversed the defendant's burglary conviction, explaining, "We cannot assume that the door was wide open and we cannot assume that the door was closed. The record wholly fails to disclose whether the appellant used any force to push open the door if it was closed or partially closed or if he walked through the open doorway." *Id.* We have similar circumstances here. Simmons' own words to Harper and his grandmother proved that he killed Garth. But, even accepting what the majority puts forth, we have no positive assurance that the children closed any door to the house when they went outside to

play. No evidence permitted a rational jury to find that Simmons *broke into* Hatchett's house (e.g., opened a door or window, forcefully or otherwise). To find him guilty of capital murder, proof of the breaking was required.

¶66. Hatchett also testified that her children would frequently leave the house to go outside to play while she was gone, and there is no evidence in the record from her testimony that the children left the house before she did. The majority states that the jury could reasonably infer that the children left the home before the events leading to Garth's death occurred and returned after he was killed. The children were ages 11, 13, and 14. Hatchett's testimony that the children normally go in and out of the house leaves speculation open on the question of what the children actually did in the absence of evidence showing how Simmons entered the home. Where is the evidence that the children opened the door *and closed it* if they went outside? There is no fact in evidence upon which an inference could be made. There is no one else who testified with first-hand knowledge or forensic evidence; even accepting what Hatchett said, there is still nothing showing that the children closed the door when they left to go outside.[5] As in *Rankin*, we cannot assume.

¶67. But if we are to accept the majority's assumption that the children left the house before the events leading to Garth's death and returned after he was killed, it is impossible

---

[5] The majority cites *Naylor v. State*, 248 So. 3d 793 (Miss. 2018), regarding allowable inferences in the context of burglary, but the case, like *McLain* and *Harris*, is immediately factually distinguishable. The testimony from the victim that his Volvo had been locked at the time Naylor was alleged to have burglarized it was supported by the physical evidence that showed an ID card was inside a closed glove box, which had to have been opened (i.e., broken into) to retrieve the card, allowing the type of inference the majority would have us conjure. *Naylor*, 248 So. 3d at 795 (¶6).

for this Court to also infer that there is a possibility the children closed the door when they left. The police did not take any statements from the children during the investigation. There was no testimony or other evidence from the children during trial to prove that they did not leave any doors to the house open while going in and out to play. If we apply this rationale that the State posits, this Court should find that it is a reasonable inference that the children could have left an entryway to the home open, negating the element of breaking on Simmons' behalf.

¶68.　Simmons, as in *Rankin* and *Fox*, deserves a criminal conviction rested upon finite evidence and not probabilities or surmise. *Id*. There is a hole the evidence did not fill. There was not any evidence or testimony provided that clearly proved a burglary had occurred. As we said in *Fox*, we cannot uphold a case through mere guesswork, speculation, and conjecture, which is what the majority is trying to do here.

¶69.　The State, whether it be law enforcement or the prosecution, certainly left an important stone unturned. There is no evidence or testimony to prove the necessary breaking element of burglary. The majority, today, affirms that conviction anyway. What is more, the majority does it by permitting a trial court to hold a criminal defendant to a higher standard than the State. Our principles of justice and fundamental fairness are disdainful of double standards. So I repeat, the record shows the State did not provide sufficient evidence to prove that Simmons committed a breaking to constitute a burglary when Garth was killed.

¶70.　I recognize that our precedent dictates that motions for directed verdicts "in which the sufficiency of the evidence is challenged must be specific." *Gary v. State*, 11 So. 3d 769,

34

771 (¶8) (Miss. Ct. App. 2009) (citing *Jordan v. State*, 936 So. 2d 368, 372 (¶20) (Miss. Ct. App. 2005)). And arguments made for the first time on appeal face a procedural bar. *E.g.*, *Maness v. K & A Enters. of Miss. LLC*, 250 So. 3d 402, 410 (¶21) (Miss. 2018). But this Court retains the power to notice plain error, *see* M.R.A.P. 28(a)(3), and the State's failure to prove to the jury all the essential elements of the offense charged was exactly that.

¶71. I made a very similar warning in a recent case last August where this Court affirmed a conviction of sexual battery because the issue (sufficiency of the evidence) was procedurally barred on appeal. *West v. State*, 378 So. 3d 422, 428 (¶16) (Miss. Ct. App. 2023). This Court justified affirming the conviction despite the lack of evidence partly because "[n]either in his motion for a directed verdict nor in his motion for a JNOV did [the defendant] raise even a general challenge to the sufficiency of the evidence . . . ." *Id.* at (¶15). I narrowly dissented in part because a criminal defendant's right to due process demands "that the State prove each element of the offense beyond a reasonable doubt." *Id.* at 431 (¶28) (Westbrooks, J., concurring in part and dissenting in part) (quoting *Washington v. State*, 645 So. 2d 915, 918 (Miss. 1994)). "[A] defendant's failure to object to the State's failure to prove . . . an essential element of the offense [does not] waive the State's failure to meet its burden." *Y. Evans*, 919 So. 2d at 235 (¶15). This Court today goes even further than *West* (where the defendant outright did not challenge the sufficiency of the evidence) to hold that even though a criminal defendant moved for a directed verdict and requested a peremptory instruction explicitly because of the "insufficiency of the evidence," his element-empty conviction stands because he didn't specify what the government had not yet even

evinced. By affirming Simmons' conviction and sentence, we are establishing troublesome precedent. In my humble view, when our appellate judicial institution requires perfect precision from the defendant when challenging the elements that the State is obligated to prove, but does not demand the same from the State in its pursuit of a conviction, it erodes those principles of justice and fundamental fairness. It also passively shifts the burden of proof from the mighty, powerful State to the disenfranchised defendant to prove a critical fact that was not his burden to prove at trial. *Mullaney v. Wilbur*, 421 U.S. 684, 698-99 (1975) (finding liberty interest in degrees of murder and violation of due process, explaining, "Maine could impose a life sentence for any felonious homicide—even one that traditionally might be considered involuntary manslaughter—unless the defendant was able to prove that his act was neither intentional nor criminally reckless").

¶72. Viewing the evidence in the light most favorable to the State, no rational juror could have reasonably found that Simmons killed Garth during the commission of a burglary; moreover, that finding could not be made beyond a reasonable doubt. "As the crime underlying the charge of capital murder was burglary, the State was required to establish an unlawful breaking and entering of a dwelling with the intent to commit a crime therein. Miss. Code Ann. § 97-17-23." *Young v. State*, 981 So. 2d 308, 312 (¶11) (Miss. Ct. App. 2007). The evidence failed to prove beyond a reasonable doubt that Simmons broke into before entering Hatchett's home when he actually killed Garth. Accordingly, I believe that the evidence presented in this case was insufficient to uphold a conviction of capital murder. To avoid the violation of fundamental rights, I would employ a plain-error analysis and hold

that the evidence is insufficient, requiring Simmons' capital murder conviction to be reversed and rendered.

¶73.   For these reasons, I respectfully dissent.

**McDONALD, J., JOINS THIS OPINION.**